[No. 8885.  Department Two.  January 4, 1911.]

THE STATE OF WASHINGTON, *Respondent*, v. J. E. CRADDICK, *Appellant*.[1]

CRIMINAL LAW—EVIDENCE OF OTHER CRIMES—FALSE PRETENSES. In a prosecution for obtaining money under false pretenses, through a conspiracy with a swindling clairvoyant who predicted and advised the investments, evidence of other similar offenses, committed by the same conspirators in the same way upon other dupes, is admissible to show that the acts were done as part of a general scheme of conspiracy to defraud, the unusual and extraordinary means employed making an exception to the general rule that evidence of other crimes is not admissible.

FALSE PRETENSES—EVIDENCE—CONSPIRACY—ADMISSION OF CODEFENDANT. In a prosecution for obtaining money under false pretenses through a conspiracy with a swindling clairvoyant, photographs of the latter, in oriental costume, with writings thereon, of which he was author, scoffing at the gullibility of his victims, are admissible in evidence.

FALSE PRETENSES—DEFENSES—RESTITUTION. In a prosecution for obtaining money under false pretenses for worthless stock, evidence of the value of land traded to the prosecuting witness in restitution is inadmissible, that being no defense.

Appeal from a judgment of the superior court for Spokane county, Hinkle, J., entered March 4, 1909, upon a trial and

[1]Reported in 112 Pac. 491.

conviction of obtaining money under false pretenses. Affirmed.

*J. F. Blake* and *John L. Willey*, for appellant.

*Fred C. Pugh* and *D. W. Hurn*, for respondent.

DUNBAR, J.—The information in this case charges, that the defendant, J. E. Craddick, and John Doe, *alias* Sahara, unlawfully and by false and fraudulent representations received from one Ed. Thompson $800 in money; that they represented that the Pinar Del Rio Mining Company was the owner of a gold mine situated in Okanogan county, Washington; that said mine had been opened, and that a ledge of ore about seventy-five feet in width had been discovered; that the extent of said ledge had not been ascertained because the same had not been cut out to its full extent; that said mine was located adjacent to, and immediately connected with, another mine of the same character, and was close to and in the immediate vicinity of the Alden mine, the Alden mine being one of the richest gold mines in the country, and that said Pinar Del Rio was located a short distance north of Oroville, state of Washington, in close proximity to a railroad; whereas, in truth and in fact, the said Pinar Del Rio mine had not been opened, and no ledge of ore of any kind or character had been struck, and said mine was not adjacent to or connected with any mine of like character or any other mine whatever, and was not close to, or in the immediate vicinity of, the said Alden mine, but was at least twenty-five miles distant therefrom; that in fact said mine was not located near Oroville, but was at least seventy-five miles distant therefrom; and in fact said mine was not located near any railroad line, but was at least seventy-five miles distant from a railroad line; that Thompson, then and there relying upon said representations and pretenses, paid to said Craddick and said Sahara the sum of $800, etc.

It is the claim of the state that the false and fraudulent representations and pretenses charged against the defendant

in the information are the direct result of a conspiracy entered into between Conlin *alias* Sahara, Sampson *alias* Haas, and defendant Craddick, to defraud generally any and all persons who might become patrons of the clairvoyant Sahara, and through his seductive influences and deceptive practices, seek of him advice as to how to make good, safe, and profitable investments of their savings. Under the arrangements made between them, Sahara was to furnish the purchasers; the defendant Craddick, the alleged profitable securities, and Sampson was the go-between, the man who introduced the one selected by Sahara as the probable victim to Craddick; and the spoils were to be divided equally between Sahara and Craddick, after the payment to Sampson of his commission out of the transaction. It appears that, in furtherance of the combination and to furnish investments, stock called "Brittle Silver" was used for a time, and after that stock had become too generally known, the Pinar Del Rio Mining Company was organized, and represented to be the owner of a gold mine in Okanogan county, of promising wealth such as we have described. The transaction between this trio and Thompson was proven. Thompson, after having been steered into Sahara's offices, consulted him concerning profitable investments. Sahara, after going into an alleged clairvoyant state, pretending to occult knowledge and vision, interspersing his performances with all the little tricks of the trade used for deceiving victims, pretended to Thompson to see by the aid of this extraordinary occult power a man who had stock to sell, the purchase of which would be very profitable to Thompson. This man was Craddick, the defendant in this case, and the result of the whole conspiracy was that, by reason of these representations and this fraudulent performance, Thompson, who was rather a credulous, ignorant Swede, invested his $800 in this worthless stock.

There could seem to be, from the testimony in this case, but one conclusion as to the guilt of this appellant, and his participation in this conspiracy to defraud. There are, however,

some technical questions that are raised by the appellant which we will notice.  It is alleged that the court erred in permitting evidence tending to show a conspiracy between Sahara, Sampson, and Craddick; in permitting evidence tending to show the commission of similar offenses in inducing or attempting to induce Eric Johnson to invest in mining stock held by defendant; in permitting evidence tending to show the commission of similar offense in inducing or attempting to induce J. M. Wallace to invest in mining stock held by the defendant; in permitting evidence tending to show the commission of a similar offense in inducing or attempting to induce an unnamed person who had lumber to sell to invest in mining stock held by the defendant.  These four assignments may all be considered together, and in this is embraced the question whether these alleged offenses were distinct, separate, and apart from the case as made, or attempted to be made, against the defendant, to such an extent that they could not be accepted in evidence as competent proof on the case charged, viz., the attempt to defraud Thompson.  It is claimed that these were separate and distinct negotiations, in no way tending to prove the crime charged, and appellant relies upon the rule announced by this court in *State v. Bokien*, 14 Wash. 403, 44 Pac. 889; *State v. Gottfreedson*, 24 Wash. 398, 64 Pac. 523, and *State v. Oppenheimer*, 41 Wash. 630, 84 Pac. 588.

There is no doubt that the general rule is firmly established that it is not competent to show the commission of another distinct crime by the defendant for the purpose of proving that he is guilty of the crime charged.  This would only go to the extent of proving his character, and under the general rule a defendant's character cannot be put in question except through his initiative.  Under such circumstances, the defendant would be called upon to defend himself against crimes of which he had had no notice, and the effect of such testimony, as has often been said, would be to divert the

minds of the jurymen from the main question in issue, viz.,
whether the particular crime charged was proven.

As we interpret the cases above cited from this court, they
only sustain the general rule recognizing the exception that,
when the testimony offered tends to prove a general scheme
for the perpetration of a crime similar to the one with which
the defendant is charged, the testimony is admissible. In the
prosecution of criminal actions a criminal intent must be
found to exist, and such proof is admitted because the es-
tablishment of such a scheme, and crimes committed in pur-
suance thereof, affords grounds for inference against the
defendant as to intent in the matter under examination. But,
of course, the class of cases must be cognate, or it would re-
sult, as we have said, in convicting a man of one crime because
he had been shown to be guilty of another. In *State v. Bokien,
supra,* we held that, in a prosecution for obtaining goods
under false pretenses by the giving of a check upon the bank
in which the defendants had no funds, it was error to allow the
prosecution to introduce testimony of other checks having
been given by defendant to other persons when he had no funds
or deposits. In *State v. Gottfreedson, supra,* it was held, in
a prosecution for horse stealing, that it was error to admit
testimony that defendant had stolen another horse at about
the same time that the one for whose theft he was standing
trial had been taken; because, as was said, the sole effect of
the testimony would be to establish the bad character of the
defendant and prejudice the jury against him. It seems plain
that the ruling could not have been otherwise in this case,
without violating the well-established rule.

The latest expression of opinion by the court on this sub-
ject is in *State v. Oppenheimer, supra,* where it was held that,
upon a charge of obtaining money under false pretenses by
means of making a collection upon a day named, falsely repre-
senting that the accused was an agent of the prosecuting wit-
ness and authorized to collect his accounts, evidence of similar
collections from other parties, under similar fraudulent pre-

tenses, is inadmissible for the purpose of showing intent, or for any purpose, where there is nothing unusual or extraordinary in the means employed, and no connection between the collections made. In that case, *State v. Bokien* and *State v. Gottfreedson* were approved. But there was no attempt to overrule the case of *State v. Pittam*, 32 Wash. 137, 72 Pac. 1042, where it was held that, in a prosecution for embezzling funds of an employer, evidence of other acts of the defendant, in giving receipts to patrons of his employer and making entries on the books for less amounts than the money received, was admissible for the purpose of showing a general scheme which he adopted in keeping his employer's accounts, as tending to show a system employed on his part in furthering such embezzlement. The decision in this case was virtually reaffirmed in the *Oppenheimer* case, by distinguishing it from the case there under consideration.

In the case at bar, there certainly is something unusual or extraordinary in the means employed, which would bring it within the exception mentioned in *State v. Oppenheimer*, and the testimony shows a more general and far-reaching scheme or system to defraud, not only the prosecuting witness in the particular case, but credulous people generally, than any case which has been called to our attention. The testimony objected to, so far as Eric Johnson is concerned, was that, through a conspiracy with Sahara and Sampson, the appellant defrauded Johnson out of a ranch valued at $15,000, as well as personal property connected with the ranch. In relation to the Wallace transaction, Mr. Wallace testified that he went to see Sahara as a fortune teller, and that Sahara told his fortune; that Sahara did not tell him much on the first visit, but encouraged him to come again, and that he did go again, and Sahara then told him that, if he would do as he directed, he could sell his place for him; that after going into one of these alleged trances, Sahara said: "I see a man come to see you in your place of business." The witness continued:

"He says, 'I can see him,' and he described the man. He

says he was a large man, probably weighed 175 to 180 pounds. He says, 'He wears glasses.' He says, 'He has a very thick, heavy nose.' He says, 'He is a powerfully built. man.' He says, 'I can't tell you his name, but,' he says, 'the first letter of his name is C,' and he says, 'The next letter of his name is R.' 'But,' he says, 'it is the most peculiar thing that ever come to me,' he says, 'I can't tell you the rest of his name.' He says, 'He will come to see you some time this week.' "

It will be noticed that these letters are the first two letters in the defendant's name, and the descriptions was the description of the defendant, so that the dupe could readily recognize him when he put in an appearance. The testimony was that Craddick did appear, calling upon him at his place of business, and the result was that he sold him a lot of worthless stock. In the trance into which Sahara went, he scribbled off the words, "Brittle Silver stock," showed them to Wallace, and told him that, if it was possible for him to make a deal in any way with the man who called upon him and whom he had described, to make it. Such was the testimony in relation to the attempt of these three men, through the medium of this swindling clairvoyant, to defraud others. So that this case is not governed at all by the rules laid down in the cases cited by the appellant. There, there was no charge of any organized conspiracy, but they were all merely cases where the defendants had committed other crimes of a similar nature.

"The admission of evidence, in a trial for uttering counterfeit bills or base coin, of the utterance of similar bills or coin to other persons about the same time . . . is fully recognized in the courts of this state." *Commonwealth v. Jackson,* 132 Mass. 16.

See, also, *Commonwealth v. Stone,* 4 Met. 43; *Commonwealth v. Bigelow,* 8 Met. 235.

For the purpose of showing guilty knowledge in a class of cognate cases, where false plate or jewelry has been sold, evidence of other sales of similar ware is admissible. *Regina v. Francis,* L. R. 2 C. C. 128. Another exception to the general rule that independent crimes cannot be proved, is found

in that class of cases where acts are shown to have been done as part of the same plan or scheme of fraud. *Jordan v. Osgood*, 109 Mass. 457, 12 Am. Rep. 731. Where there was evidence of a conspiracy between the defendant and a deputy collector to defraud the revenue, by entering goods at an undervaluation, evidence of other transactions in the conduct of criminal enterprises was admissible. *Bottomley v. United States*, 1 Story 134. Where a conspiracy to defraud is alleged, other fraudulent purchases than those set out in the indictment, made about the same time and in pursuance of the conspiracy, are admissible for the purpose of showing the intent with which the goods were purchased. *Commonwealth v. Eastman*, 1 Cush. 189, 48 Am. Dec. 596. And a great many cases involving the same principle are reported, too numerous for special citation.

While it is difficult sometimes to distinguish between the circumstances which properly fall within the rule and those which fall within the exception, it is universally held we think that, where the testimony offered shows an act committed in furtherance of a general scheme or conspiracy, the testimony is admissible. The rule is happily stated by Wharton, in his work on Criminal Evidence (9th ed.), § 32, where it is said, in discussing this question:

"In order to prove purpose on the defendant's part, system is relevant, and in order to prove system, isolated crimes are admissible from which system may be inferred."

See, also, *Yakima Valley Bank v. McCallister*, 37 Wash. 566, 79 Pac. 1119, 107 Am. St. 823, 1 L. R. A (N. S.) 1075.

We think there was no error in the admission of the testimony objected to.

It is also alleged that the court erred in admitting certain photographs of Sahara, with certain written legends shown on the margin. One of these exhibits is a photograph of Sahara in a sort of oriental costume, in a quiescent attitude, with the following written on the face of the photograph: " 'The great' waiting for a 'sod-buster' with sufficient shekels

to make it interesting." Another represented him in the same costume, apparently telling a woman's fortune from the lines in the palm of her hand, which he was closely scrutinizing, and on this card was written: " 'The great' at work on a sucker." There were other photographs of similar character. It is a well-known psychological fact that tinsel and trappings and unaccustomed brilliant garbs make an impression on the ignorant mind. Sahara knew this. These things were a part of his stock in trade. They were aids to the perpetration of his frauds, and the jury had a right to be informed of any circumstance tending to prove the fraudulent scheme and the manner in which it was conducted. The writing on the photographs was a vaunting admission by Sahara of the falsity of his pretenses, and constituted a scoffing at the gullibility of his victims. There was competent testimony to the effect that he was the author of the writings.

It is also contended that the court erred in not permitting appellant to show the value of certain land which, just before the trial, he had traded to Thompson for the stock which he had sold him. The value could not have been material. If it had been proven that at that time appellant had returned to Thompson the $800 which he had obtained from him, with interest, it would not in any event have been a defense to the action. A thief will not be accorded immunity by the law by simply returning the stolen property when he finds that his crime has been discovered.

We have examined the other assignments of error, but find them entirely without merit. The judgment is affirmed.

RUDKIN, C. J., CROW, CHADWICK, and MORRIS, JJ., concur.