[No. 10504.  Department Two.  August 12, 1913.]

THE STATE OF WASHINGTON, *Respondent*, v. LINDA BURFIELD HAZZARD, *Appellant*.[1]

HOMICIDE—INFORMATION—CERTAINTY AS TO TIME—CONTINUING OFFENSE.  An information charging murder by the withholding of food between specified dates and the date of the death is not subject to demurrer for uncertainty or repugnancy in its allegations as to the time of the offense, as it charges a continuing offense and not a crime committed on divers or different days.

CRIMINAL LAW—VENUE—CRIME COMMITTED IN TWO COUNTIES.  Under an information charging murder in the first degree by the withholding of food between specified dates, begun in one county and consummated in another county, the venue may be properly laid in the county where consummated, under Rem. & Bal. Code, § 2113, providing that the jurisdiction is in either county.

HOMICIDE—INFORMATION—ELEMENTS OF OFFENSE.  An information charging murder in the first degree by withholding of food from the deceased, charges an affirmative act, and is not bad for failure to charge a legal duty to furnish food; and if it were otherwise, it is sufficient to charge that the deceased was in the care and custody of the defendant who had undertaken to provide sufficient food.

CRIMINAL LAW—EVIDENCE—OTHER OFFENSES—ADMISSIBILITY.  Upon a prosecution for murder in the first degree by withholding food from the deceased, evidence tending to prove an attempt to commit the same crime upon her sister receiving the same treatment at the

[1]Reported in 134 Pac. 514.

same time, is admissible for the purpose of showing a plan or system adopted by the defendant for the accomplishment of the purpose which constituted the offense.

WITNESSES—CROSS-EXAMINATION—SCOPE. Upon a prosecution for murder in the first degree by withholding food from the deceased, it is not error, on redirect examination of a witness for the state, to allow the witness to testify as to the appearance of a person who had died for want of food at a house where she first met the defendant, where she had first testified as to the appearance of the deceased, and the defense had opened up the question on cross-examination after warning that such course would permit the state to go into it.

WITNESSES — IMPEACHMENT — INCONSISTENCY OF PREVIOUS STATEMENTS. Upon a prosecution for murder in the first degree by withholding food from the deceased, a witness for the state who had merely detailed the facts regarding the condition and treatment of the deceased while under the defendant's care, without stating any opinion of the treatment, may not be impeached by a previous letter written by the witness expressing an opinion that the defendant had done nothing wrong.

CRIMINAL LAW—EVIDENCE—OTHER OFFENSES. In a prosecution for the murder of one of two sisters, by withholding food under a fasting treatment, the surviving sister may testify as to the treatment she received, where they were together, occupying the same rooms, received the same treatment, and were so intimately associated as to make the treatment substantially one continuous transaction.

HOMICIDE—EVIDENCE—OTHER OFFENSES—LESSER DEGREES. In a prosecution for murder in the first degree by withholding food under a fasting treatment, testimony of experts as to the medical skill and care used by the defendant in treating the deceased is not inadmissible because it tends to prove the crime of malpractice; since, if there was no premeditated design, the evidence as to the want of skill and care tended to prove a homicide of a lesser degree.

HOMICIDE—EVIDENCE—ADMISSIBILITY. Upon a prosecution for murder by the withholding of food from the deceased under a fasting treatment, it is not prejudicial error of which defendant can complain that, on redirect examination of witnesses, the state made use of a medical book which was not a recognized authority, where the defendant had first used the book on cross-examination for the purpose of setting forth certain views of the author favorable to the defendant.

SAME. Upon a prosecution for murder by the withholding of food from the deceased under a fasting treatment, it is not reversible error that, on cross-examination of an employee of an under-

taker's firm, the business relations were shown, and it was elicited that the bodies of five or six persons who had been defendant's patients had been buried by the firm, and that wide latitude was allowed the cross-examiner, where it was unreasonable to hold that in a long trial it had had any material effect upon the verdict.

CRIMINAL LAW—TRIAL—APPEAL—MISCONDUCT OF COUNSEL. Misconduct of counsel in suggesting in the presence of the jury that defendant was signaling to witnesses on the stand is harmless, where the jury was immediately instructed to disregard it.

HOMICIDE—EVIDENCE—HEARSAY—REBUTTAL. Upon a prosecution for murder by withholding food from the deceased under a fasting treatment, statements of the deceased as to the food she was receiving are not inadmissible as hearsay, in rebuttal, where the defendant introduced evidence of other statements made by the deceased upon the subject.

SAME—HEARSAY—RES GESTAE. Upon a prosecution for murder by withholding food from the deceased under a fasting treatment, the offense is a continuing one, making statements of the deceased as to the food she was receiving admissible as a part of the res gestae.

Appeal from a judgment of the superior court for Kitsap county, Yakey, J., entered February 7, 1912, upon a trial and conviction of murder in the second degree. Affirmed.

*Karr & Gregory* and *J. H. Buchanan,* for appellant.

*Thomas Stevenson,* for respondent.

MAIN, J.—The defendant in this case was charged by information, filed by the prosecuting attorney, with the crime of murder in the first degree. The information, so far as material, is as follows:

"She, the said Linda Burfield Hazzard, in the county of King and State of Washington, on the 28th day of February, A. D. 1911, and on divers days between the said 28th day of February, A. D. 1911, and the 22nd day of April, A. D. 1911, and she, the said Linda Burfield Hazzard, in the county of Kitsap and State of Washington, on the 22nd day of April, A. D. 1911, and on divers days between said 22nd day of April, A. D. 1911, and the 20th day of May, A. D. 1911, willfully, unlawfully, feloniously and with premeditated design to effect the death of Claire Williamson, did kill and murder the

said Claire Williamson by depriving and keeping from the said Claire Williamson all food and sustenance except as follows, to wit: The juices of fruits in quantity and not to exceed two fluid ounces daily upon the days and dates aforesaid, and the broth of vegetables not to exceed eight fluid ounces in quantity daily upon the days and dates aforesaid, said food not being sufficient in quantity and quality to sustain life in her, the said Claire Williamson's body, the said Claire Williamson then and there being a human being in the care, custody and control of her, the said Linda Burfield Hazzard, the said Linda Burfield Hazzard then and there having undertaken the duty to care for, to keep and to provide sufficient food and sustenance to sustain life in her, the said Claire Williamson's body, the said Linda Burfield Hazzard then and there having in her possession money, property and means belonging to the said Claire Williamson sufficient to obtain sufficient food and sustenance to sustain life in her, the said Claire Williamson's body, the said Claire Williamson being then and there weak and afflicted in body and mind and unable to care for herself and unable to obtain food and sustenance for herself, and the said Claire Williamson then and there being under the dominion and subject to the orders and commands of her, the said Linda Burfield Hazzard; by means of which acts and omissions to act as aforesaid, willfully, unlawfully, feloniously and with premeditated design to effect the death of the said Claire Williamson, she, the said Linda Burfield Hazzard, did then and there mortally deplete and reduce the body, strength and vitality of her, the said Claire Williamson, by reason whereof, she, the said Claire Williamson, there on all the days and times before-mentioned, until the 19th day of May, A. D. 1911, sickened and languished with a mortal sickness and feebleness of body, so as aforesaid, by the said Linda Burfield Hazzard created, brought about and produced willfully, unlawfully, feloniously and with the premeditated design to effect the death of the said Claire Williamson, on which last mentioned day, to wit, on the said 19th day of May, A. D. 1911, in the county of Kitsap and State of Washington, she, the said Claire Williamson, then and there of said mortal sickness and feebleness of body did die, the said killing being not excusable and not being committed by accident or misfortune in doing any lawful act by lawful means, with ordinary caution and without any unlawful intent, and the said killing

not being justifiable, and said Linda Burfield Hazzard not then and there being a public officer, or person acting under the command or in the aid of a public officer and the said killing not being in the lawful defense of the said Linda Burfield Hazzard, or of her, the said Linda Burfield Hazzard's husband, parent, child, brother or sister, or of any other person in her, the said Linda Burfield Hazzard's presence or company, and not being when there was reasonable ground to apprehend a design on the part of the said Claire Williamson to commit a felony, or to do some great personal injury to her, the said Linda Burfield Hazzard, or to any such person then and there in her presence or company, and there not being then and there imminent danger of such said design being accomplished, and the said killing being not then and there in the actual resistance of an attempt to commit a felony upon the said Linda Burfield Hazzard, or in the presence of her, the said Linda Burfield Hazzard, or to commit a felony upon or in a dwelling or other place of abode in which she, the said Linda Burfield Hazzard, then was, contrary to the statutes in such case made and provided and against the peace and dignity of the State of Washington."

To this information, a demurrer was filed, on various grounds which will be noticed subsequently herein. The demurrer was overruled, and on January 15, 1912, the cause was called for trial. Subsequently, and on February 4th, the jury returned a verdict finding the defendant guilty of manslaughter. Motion for new trial was made and overruled. Thereupon the defendant was sentenced to the state penitentiary at Walla Walla for not more than 20 years and not less than 2 years. From this judgment and sentence, the appeal is prosecuted.

The facts, as contended for by the state and as shown by its evidence, may be briefly outlined as follows: During the month of September, 1910, Dora Williamson and Claire Williamson, two English young women, the former then 37 years of age and the latter 34, were stopping temporarily at Victoria, B. C. The parents of these ladies had both died many years before. They had no relatives in this country, except an uncle in Portland, Oregon, and an aunt at El Toro, Cali-

fornia, and two cousins, daughters of the aunt. Seeing an advertisement of the defendant in one of the Seattle newspapers, correspondence was opened with her by Claire Williamson relative to her system of healing. Dora Williamson was then suffering somewhat from rheumatism. The defendant, in response to a letter, forwarded a book entitled, "Fasting for the Cure of Disease," written by herself; and also a pamphlet or booklet giving an account of a sanitarium at Olalla, Washington, which the defendant operated.

During the month of October, the girls went to California to spend the winter with the aunt at El Toro. From the latter place some correspondence continued between the defendant and one or both of the girls. During the month of February, 1911, the girls had concluded that one of them would return to London, England, and the other to Australia, the latter place being their place of residence. Before going, however, they concluded to come to Seattle and take a course of treatment with the defendant. While the girls were in California and at the time they came to Seattle, they were in apparent reasonably good health. Dora suffered occasionally from rheumatism and indigestion, and Claire from a displacement of the uterus which would readily respond to treatment. The fact that they were coming to Seattle to take treatment from the defendant was not disclosed by the girls to any one.

They arrived in Seattle on February 26, 1911, and on the day following, the 27th, interviewed the defendant at her office. The girls being strangers in the city, an apartment in the Buena Vista apartment house was secured for them by the defendant. At this interview, the girls arranged to take treatment from the defendant every day except Saturdays and Sundays, for a consideration of $60 per month each. The treatments consisted of massage or rubbing, the abstaining from food, except fruit juice, asparagus water, and vegetable broth with a small bit of butter therein about as large as the thumb nail; a warm bath every day, or practically every day; and an enema of from four to six quarts

of warm water each day. From the 27th day of February until about the 15th day of March, these treatments continued, the girls going to the office of the defendant each day for their rubbing or massage, and conforming in other respects to the treatments as prescribed by the defendant. About the 15th of March, the girls being in such a weakened condition that they were no longer physically able to go to the office for treatment, a nurse was secured by the defendant to care for them at their apartment. The defendant, however, called almost daily other than Saturdays and Sundays, to give the treatments. Thereafter the same treatments in the way of massage or rubbing, abstaining from food, bathing, and the enema were adhered to. The girls constantly grew weaker and more emaciated.

During this time the defendant repeatedly inquired of the girls concerning their relatives, their property, their business and income. Upon one occasion while visiting them in their apartment and discussing business affairs with them, she advised them that it was unsafe to keep their papers, money, and jewelry in their apartment; and thereupon induced them to give her their papers and other articles of value, including the rings from their fingers, in order that they might be placed in the safe in her office for safe keeping. During all this time the girls seemed to have implicit confidence in the defendant, they doing all things which she directed and abstaining from all which she forbade.

On April 22d, the girls were, by the defendant, taken from their apartment to Olalla, Washington, where the defendant claimed to be operating a sanitarium. At this time they were unable to walk, and were carried from their beds in the apartment upon stretchers to the ambulances, and by the ambulances conveyed to the dock where they were to take a special launch to Olalla. While waiting at the dock and remaining in the ambulances, the defendant's then attorney appeared, and Claire Williamson there executed a codicil to her will wherein she bequeathed an annuity to the Hazzard

Institute of Natural Therapeutics; and also at the same time executed an order upon a small slip of paper apparently torn from a note book, directed to the Bank of Montreal, at Victoria, B. C., instructing that the balance of her account there in the sum of $1,005 be paid to the order of Linda Burfield Hazzard, the defendant, and that it be placed to her credit in the bank of the Northern Bank & Trust Company of Seattle; and at the same time executed a direction to the London & Westminster County Bank, High street, Kensington, London, England, instructing that they send money or draft to her Seattle address in the care of Dr. Linda Burfield Hazzard. This order was made to cover all moneys or credits then on hand or thereafter received by such bank. From the dock the girls were taken in a special launch to Olalla, where they remained in the house occupied by the defendant, and under her direction they received the same treatment as previously and were is such a condition as to require a nurse. They constantly grew more emaciated. They were in such a condition that at times they would become unconscious during the taking of the bath or the enema.

On May 19th, Claire Williamson died. About a week before her death, the defendant suggested doubt as to her recovery. Both girls at this time were living skeletons, their weight being approximately one-half what it had been when the treatments began almost three months previous. During the time the girls were in Seattle, and during the time they were at Olalla prior to Claire's death, they repeatedly asked for food. Each time they were told by the defendant that the poison was not yet out of their system; that they must not take food until their system was entirely clean; that it would be dangerous to do so and might result fatally. The morning following the death of Claire, Dora was downstairs upon a porch at one end of the house near a cliff or precipice. The defendant at this time, while in conversation with her, suggested that a prior patient had attempted at one time to commit suicide by leaping over the precipice. Dora then

said that such a matter should not at that time be called to
her attention while she was weak and enfeebled and her sister
dead in the upstairs room.   During the time that the girls
were at Olalla and prior to May 19th, the defendant had re-
peatedly enjoined Dora from talking business with Claire,
and had told her that she (Dora) was mentally unsound.   Re-
peatedly, however, the defendant would ask her if she had any
business matter that was troubling her.   On May 22d the
uncle at Portland was notified of Claire's death.   His ad-
dress had been known for sometime prior thereto.

On May 27th, Dora executed a power of attorney to Sam-
uel C. Hazzard, the husband of the defendant, authorizing
him to receive from the Canadian Bank of Commerce, at Vic-
toria, B. C., any and all moneys in the saving department
thereof, and on the same day addressed a note directed to
the bank requesting it to transfer $583 to Samuel C. Hazzard,
or order, and charge the same to her account.   This money
was subsequently received by Mr. Hazzard.   On May 27th,
the defendant filed a petition in probate in the probate court
alleging that Dora Williamson was an invalid and for a long
time past had experienced great physical suffering, and was
mentally incompetent to manage her own affairs, and praying
that a guardian be appointed.   Thereafter, and upon a hear-
ing, the defendant was appointed guardian of the person and
estate of Dora Williamson.   No notice of this hearing or of
the filing of the petition was served on the alleged incompet-
ent person.

About June 1st, a Miss Conway, the nurse of the girls
during their childhood, in response to a cablegram sent to
her prior to Claire's death, arrived at Olalla from her home in
Australia.   Thereafter Dora was under her care and was
given food daily.   Her condition improved, and sometime
during the month of July, she was removed by Miss Conway
to Tacoma, Washington.   ·

The foregoing statement is only a brief summary of the
evidence introduced on behalf of the state.   The statement of

facts covers approximately twelve hundred pages. In such a case, in the space allotted in an opinion, a complete statement of the facts is impossible. Other facts will be noticed as they become germane in considering the many questions which are presented upon this appeal. The evidence on behalf of the defendant conflicted in many particulars with that of the state, and tended to exonerate the defendant from the charge of wrongdoing. If the evidence of the state is to be believed, the defendant was guilty; if the evidence introduced by the defendant is to be believed, no crime was committed.

The errors claimed are: (1) the overruling of the demurrer to the information; (2) error in admitting evidence of transactions with Dora Williamson; (3) error arising from the redirect examination of the witness Mrs. Fields; (4) error in excluding a letter written by the witness Esther Cameron; (5) error in permitting evidence as to the treatment given Dora Williamson; (6) error predicated upon the expert testimony of the medical witnesses; (7) error arising from the alleged improper use of a work on legal medicine; (8) error in the cross-examination of the witness Andrew Hill, touching the business relations of the defendant with E. R. Butterworth & Sons; (9) misconduct of counsel; (10) error in permitting Dora Williamson to testify as to the statements made to her by Claire concerning food; (11) error in refusing to direct a verdict for the defendant; (12) error in the instructions.

I. The defendant by the demurrer to the information challenged its legal sufficiency upon the grounds, (1) for uncertainty and repugnancy in its allegations as to the time of the offense; (2) for uncertainty and repugnancy in its allegations as to the venue; (3) for failure to charge a crime in that it failed to allege a legal duty on the part of the defendant; and (4) for failure to charge a crime in that it failed to show that the acts set out caused the death of the deceased. It is contended that an information which avers that the defendant, on divers or different days, committed an

offense is bad as against a demurrer. As a proposition of law, this may be accepted as correct. It does not, however, apply in this case. The information here charges a crime by the withholding of food between dates specified and the date of the death of the deceased. This does not charge the crime to have been committed on different days, but does charge continuing conduct between the dates mentioned producing death at a certain time. Neither is the information uncertain as to the venue of the offense or failure to show jurisdiction in the court. The acts constituting the crime began in King county and were later consummated in Kitsap county. Where a crime is committed partly in one county and partly in another, the jurisdiction is in either county. Rem. & Bal. Code, § 2113 (P. C. 135 § 1129). In this connection the appellant cites the case of *United States v. Marx*, 122 Fed. 964. That case, in our opinion, is distinguishable from the question here presented; but if it is not, we think it would not be controlling.

The contention that the information is bad for failure to charge a legal duty upon the defendant to furnish food is equally not well founded. The defendant is charged with the crime of murder in the first degree in that, with premeditated design, she did kill and murder Claire Williamson by the depriving and withholding from her of food and sustenance, except, etc., which produced death. This is not the charging of a crime by failure to perform a duty, but it is the charging that a crime was committed by an affirmative positive act. Under such a charge, it was not necessary to allege a duty to furnish food. But if such an allegation were necessary, it is plainly found in the information wherein it is said that Claire Williamson was in the care, custody, and control of the defendant who had undertaken to care for her and to provide sufficient food and sustenance to sustain life.

Subdivision 2, § 2055, Rem. & Bal. Code, (P. C. 135 § 1016), provides, that an information must contain "A statement of the acts constituting the offense, in ordinary and

concise language, without repetition, and in such a manner as to enable a person of common understanding to know what was intended." Section 2057 (P. C. 135 § 1019), requires that the information be direct and certain as to the party charged, the crime charged, and the particular circumstances of the crime when they are necessary to constitute a complete offense. By § 2065 (P. C. 135 § 1035), it is provided that the information is sufficient if it can be understood therefrom that the crime was committed within the jurisdiction of the court, except where, as provided by law, the act, though done without the county in which the court is held, is triable therein. We think the information is legally sufficient to charge a crime and that it adequately shows the venue. The trial court therefore ruled properly upon the demurrer.

II. Error is assigned in that evidence was admitted showing transactions of the defendant with Dora Williamson, the treatment she received and the effect thereof. It is claimed that this evidence tended to prove another and distinct crime and was therefore inadmissible. The general rule is well settled, subject to well defined exceptions, that the state cannot prove against a defendant any crime not alleged in the information or indictment for the purpose of aiding the proofs that a person charged is guilty of the crime for which he is being prosecuted. *Commonwealth v. Jackson*, 132 Mass. 16; *Shaffner v. Commonwealth*, 72 Pa. 60, 13 Am. Rep. 649; *People v. Molineux*, 168 N. Y. 264, 61 N. E. 286, 62 L. R. A. 193; *State v. Marselle*, 43 Wash. 273, 86 Pac. 586; *State v. Ness*, 71 Wash. 334, 128 Pac. 664. One of the exceptions to this rule is that evidence of a separate and distinct crime from the one for which the defendant is being prosecuted may be shown by evidence for the purpose of showing a plan or system adopted by the defendant for the accomplishment of the purpose which constitutes the offense, and not for the purpose of proving independent offenses. *State v. Pittman*, 32 Wash. 137, 72 Pac. 1042; *State v. Craddick*, 61 Wash. 425,

112 Pac. 491; *State v. Downer*, 68 Wash. 672, 123 Pac. 1073. Under the rule of these cases, the evidence as to Dora was competent for the purpose of showing a plan or scheme on the part of the defendant to effect the death of both of the girls. The proof of such plan or scheme would afford grounds for the inference that the defendant was actuated by a criminal intent.

III.   The next error assigned is the ruling of the court in permitting one Mrs. Fields, a witness called by the state, on redirect examination, to testify as to the appearance of a person who had died from want of food, who the person was, and that she had met Mrs. Hazzard at the home of such person.   This occurring on redirect examination, whether it was error must depend upon the cross-examination which had been previously conducted by the defendant.   This witness had occupied an apartment in the Buena Vista apartment house near that occupied by the Williamson girls.   On direct examination she had testified as to their appearance during the time that they remained in the apartment.   On cross-examination the witness was asked whether or not she had ever seen any one afflicted with, or who had died from, the effects of certain named diseases.   On redirect examination she was then asked whether or not she had ever seen any one die from starvation, to which she answered that she had seen them waste away from not eating.   Following this, on re-cross examination she was asked to describe the appearance of the person whom she had seen die from want of food.   At this point, the court suggested to counsel for the defendant that, if they were going to open up this question, he would also allow the state to go into it.   The question was not withdrawn and the witness answered.   Then, on redirect examination, she was asked on what she was basing her opinion, and she said that it was upon the appearance of the person that she saw who had died from not eating.   In response to another question, she gave the name of the person, and was then asked whether or not it was at the house of Mrs. Harrison that she first

met Mrs. Hazzard, to which she answered "yes." An objection was then interposed on the ground that the question was incompetent, irrelevant, and immaterial. Following the course of the examination of the witness as it appears in the record, we think no error was committed in permitting the witness to answer the questions complained of.

IV.    One Esther Cameron was a witness on behalf of the state. During a period of about two weeks while the Williamson girls were at Olalla, this witness had been employed by the defendant to assist in their care. In her direct examination she detailed the facts so far as she knew them relative to what she saw and heard touching the condition of the girls and their treatment during the time that she was there employed. On cross-examination, the defendant sought to show that this witness had, in a letter to the defendant dated October 14, 1911, made the statement that she knew that the defendant had done nothing wrong. The letter was offered in evidence and excluded. Error is predicated upon this ruling. The rule adopted by some authorities is invoked, which is that, where there is an inconsistency between the belief of a witness, as indicated by his previous declarations, and that which would naturally be indicated by his examination in chief, such previous declarations may be shown. But this rule, we think, is inapplicable here. The testimony of the witness in chief was simply a detailing of facts without indicating a general belief on the part of the witness as to the defendant's guilt or innocence. The statement in the letter was nothing more than the expression of an opinion. In such a case, the rule is that previous statements made by the witness as to a matter of opinion or a conclusion cannot be shown although they may tend to contradict inferences which might be drawn from the recital of the facts as given in the testimony of the witness during the examination in chief. *People v. Stackhouse*, 49 Mich. 76, 13 N. W. 364; *Saunders v. City & Suburban R. Co.*, 99 Tenn. 130, 41 S. W. 1031; *Drake v.*

*State*, 29 Tex. App. 265, 15 S. W. 725; *Welch v. State*, 104 Ind. 347, 3 N. E. 850.

In the *Stackhouse* case, it is said:

"The opinion or suspicions of the witness out of court, although inconsistent with the conclusions which the facts she testifies to on the trial would warrant, cannot be made the basis of an impeachment. This is so firmly settled by the authorities that the question cannot be considered an open one."

V. Dora Williamson, over the objection of the defendant, was permitted to testify as to the treatment she received while in Seattle. In this, we think there was no error. The two girls were together when the contract for the treatment was made; they received the same treatment, occupied the same suite of rooms, and were so intimately associated as to make the treatment the two girls received substantially one transaction. Where the conduct complained of constitutes one continuous transaction, evidence of all the facts and circumstances connected therewith is relevant. *State v. Ray,* 62 Wash. 582, 114 Pac. 439.

VI. Certain physicians, in answer to hypothetical questions, were permitted to testify as to the degree of medical skill and care used by the defendant in treating the deceased. Complaint is made of this testimony by the defendant because it is contended that it tends to prove the crime of malpractice, while the defendant was charged with murder in the first degree by the withholding of food. The law is unquestioned that the evidence introduced must either support or tend to support the crime charged in the information. In this case the defendant was charged with murder in the first degree by the withholding of food with the premeditated design to produce death. Within this charge are included two lesser crimes, that of murder in the second degree and manslaughter. If the defendant did not withhold food with a premeditated design, but did withhold food through failure to exercise that

degree of care which the law imposes upon one practicing her profession, then she would not be guilty of murder in the first degree, but would be guilty of a lesser crime. The evidence therefore was admissible under the charge as laid in the information.

VII. During the cross-examination of one Dr. Munn, a witness called on behalf of the state, the defendant produced a book apparently entitled, "Draper's Legal Medicine," and inquired of the witness if he were familiar with it, to which he answered that he was not. Notwithstanding this fact, the book was further used in cross-examination by reading to the witness certain portions thereof in which the author's views were set forth, and then inquiring whether the witness would consider that good authority, or probably true; the witness in each case answering, either that he did not know Draper at all, or that what the author said was probably true, or that he did not think that Draper knew all about it as no one did. On redirect examination, counsel for the state took the same book and read therefrom a paragraph which was unfavorable to the defendant; and concluded by asking a question which was germane to a previous subject of inquiry. To this question the defendant objected because it was incompetent, irrelevant and immaterial, leading, and not proper cross-examination, which objection was overruled and the question answered. It is argued that this use of the book by the state was prejudicial error. It would appear that the use of the book by both parties was not in accordance with the accepted standards. But we think, in view of the course the cross-examination took, that it would be too rigid a rule to hold that the redirect examination constituted reversible error.

VIII. The next assignment of error arose out of the cross-examination of one Andrew Hill, a witness who testified on behalf of the defendant. This witness, on his direct examination, testified that, at the request of Dr. Hazzard, he had

removed the girls from the apartment to the boat, and gave
the details as to their removal, appearance and weight.   On
cross-examination, he testified that the girls were conveyed
from the apartment to the dock in ambulances owned by
E. R. Butterworth & Sons, undertakers.  He was then asked
whether he was interested in the business of this firm and he
answered: "Interested, yes."   The state then sought to cross-
examine him concerning the business relations of the defend-
ant with the undertaking firm of E. R. Butterworth & Sons.
To this objection was made.  The court ruled that the gen-
eral business relations might be shown.  The witness was then
interrogated relative to the amount of business that the un-
dertaking firm had received during the preceding three years
through the defendant; and it was elicited that, during that
time, the bodies of five or six persons who had been her pat-
ients had been buried through this establishment.  There was
no suggestion in the testimony that any of these patients had
died from other than natural causes.  On redirect examina-
tion, the witness was asked as to what his interest was in the
business of E. R. Butterworth & Sons, and replied that he
was simply an employee.  It does not appear that subse-
quently any motion was made to strike the cross-examina-
tion.   It is now contended that error was committed in the
cross-examination.   The purpose of the cross-examination
doubtless was to show the interest or the state of mind of the
witness relative to the defendant, and thereby affect his cred-
ibility.   The scope of the cross-examination of a witness is
a matter largely within the discretion of the trial court.
*Reynolds v. Pacific Car Co., ante* p. 1, 134 Pac. 512.   How-
ever, it would seem to us that the court in this instance
permitted wide latitude to the cross-examiner.  But it does
not necessarily follow that reversible error was committed
thereby.  It is not every error that calls for a reversal of a
cause; only those that appear to be prejudicial.  In *David-
son Fruit Co. v. Produce Distributors Co.*, 74 Wash. 551, 134
Pac. 510, it is said:

"In reviewing a case on appeal, courts have come to be more and more inclined to look to the effect of an alleged error rather than to the fact that an error was committed."

The trial of the cause consumed sixteen or seventeen days. In such a case, the jury reaches its verdict, not by reason of any one circumstance appearing during the trial, but by reason of the general impression which the testimony as a whole had upon their minds. It would be unreasonable to hold that a circumstance of this character in a trial consuming the time that this one did could have had any material effect upon the verdict of the jury.

IX. The misconduct of one of the attorneys for the state is assigned as error. During the cross-examination of a witness for the defendant by Mr. Kelley, the following occurred:

"By Mr. Morford: (One of the attorneys for the state) We ask that the jury be excused. By Mr. Kelley: What is the matter? By Mr. Morford: They are signaling witnesses. By Mr. Gregory: Let the jury stay here. By the Court: I am controlling this jury and I say the jury shall retire to the jury room. By Mr. Gregory: We wish to object to the court's ruling in this matter."

The jury retired, and Mr. Morford then stated to the court that the defendant had been signaling to the witnesses; that that was the reason for his request that the jury be excused. Thereupon the court stated that he had observed that the defendant had at times manifested disapproval of what certain witnesses were testifying to. The court thereupon cautioned the defendant that it was improper for her to signal witnesses or to attempt to show by motions of the head whether a witness should or should not answer in a particular way. Mr. Karr, one of the attorneys for the defendant, stated that he was positive that the defendant had not signaled to the witness. The jury was then recalled and was instructed by the court to entirely disregard the circumstance which had occurred in their presence. Cross-examination of the witness then proceeded. No exception ap-

pears to have been taken. Obviously error cannot be predicated upon this circumstance. Moreover, even if exceptions had been preserved, no error could be predicated upon this remark of counsel where the court promptly and explicitly instructed the jury to disregard the entire circumstance.

X. In rebuttal, Dora Williamson, over objection, was permitted to testify as to certain statements that Claire had made to her, both while at the Buena Vista apartments and while at Olalla, as to the food that she was receiving. It is contended that this evidence was hearsay and, consequently, inadmissible. But certain witnesses for the defendant had previously testified to statements that Claire had made to them as to the food that she was receiving. It would seem that, the defense having gone into a part of the statements of the deceased person as to the food, it would be a just rule that would permit the state in rebuttal to show other statements concerning the quantity of food with which she was furnished. In any event, the offense, as previously stated, was a continuing one dating from the time when the treatment began. The rule is that where a transaction is continuous, the statements and acts accompanying it and so woven into it by the circumstances as to receive credit from it, are a part of the *res gestae*. In 1 Wharton, Criminal Evidence (10th ed.), § 262, the rule is stated as follows:

"*Res gestae* are events speaking for themselves, through the instinctive words and acts of participants, but are not the words and acts of the participants when narrating the events. What is said or done by participants under the immediate spur of a transaction becomes thus part of the transaction, because it is then the transaction that thus speaks. In such cases it is not necessary to examine as witnesses the persons who, as participators in the transaction, thus instinctively spoke or acted. What they did or said is *res gestae;* it is part of the transaction itself.

"As long as the transaction continues, so long do acts and deeds emanating from it become part of it, so that in describing it in a court of justice they can be detailed."

In Abbott's Trial Brief, Criminal Causes (2d ed.), § 266, the rule is stated thus:

"The rule of the *res gestae* admits declarations made under the impulse of the occasion, though somewhat separated in time and place, if so woven into it by the circumstances as to receive credit from it."

See, also, to the same effect: *Mitchum v. State*, 11 Ga. 615; *McGowen v. McGowen*, 52 Tex. 657; *Little Rock, M. R. & T. R. Co. v. Leverett*, 48 Ark. 333, 3 S. W. 50, 3 Am. St. 230. It seems clear to us that, under the rule announced in these authorities, the evidence complained of was admissible.

XI. At the conclusion of the state's case in chief, the appellant moved the court for a directed verdict, claiming that the evidence was insufficient to carry the cause to the jury. After reviewing the record and considering the testimony, we think there is no merit in this contention. The evidence is abundantly sufficient to sustain the conviction.

XII. Finally it is urged that the court erred, both in the instructions given and in refusing to give requested instructions. We have considered the instructions with care, and in our opinion the instructions given fully, clearly, and accurately cover the law of the case. This is all that the law requires.

Considering the entire record in this case, it is clear that the defendant had a fair trial. Her attorneys were alert to protect her interests. There is substantial evidence to support the verdict of the jury. The trial court in imposing sentence tempered justice with mercy. The judgment will therefore be affirmed.

CROW, C. J., ELLIS, FULLERTON, and MORRIS, JJ., concur.