225 P.3d 892 (2009)
167 Wash.2d 825
STATE of Washington, Respondent,
v.
Timothy Earl PUGH, Petitioner.
No. 80850-3.
Supreme Court of Washington, En Banc.
Argued February 12, 2009.
Decided December 31, 2009.
*894 James Morrissey Whisman, King County Prosecutor's Office, Seattle, WA, for Respondent.
Maureen Marie Cyr, Washington Appellate Project, Seattle, WA, for Petitioner.
MADSEN, J.
¶ 1 The defendant contends that his state and federal rights to confrontation were violated when the trial court admitted a recording of a 911 call at his trial. He argues that the state's confrontation clause, article I, section 22 of the Washington State Constitution, is more protective than the Sixth Amendment of the United States Constitution in the context of excited utterance hearsay statements. We conclude that the defendant has failed to show that the statements at issue come within the protection afforded under article I, section 22.

FACTS
¶ 2 Defendant Timothy Pugh and Bridgette Pugh are married. In November 2004, Bridgette Pugh[1] obtained a no-contact order preventing Pugh from contacting her. On March 21, 2005, the Pughs were together at the apartment of a friend in Des Moines. At 3:13 a.m., Bridgette called 911. She reported, "My husband was beating me up really bad." Clerk's Papers (CP) (Tr. of 911 Call) at 215. When asked if he was still there, she said, "No he's walking away." Id. at 216. She provided a description of the defendant in response to the operator's questions. Id. at 216-18. When the operator asked her whether he was still there, Mrs. Pugh said, "He's just outside." Id. at 218. She said that he did not have a vehicle and he was walking toward the street. Id. She again reported being beaten but this time stated it in the present sense, "He's beating me up (unintelligible)." Id. at 219. She said she needed an ambulance. Id. The operator asked:
OPERATOR: Can you still see him from where you are?
PUGH: I'm not gonna . . . you want me to go outside so he can beat me up so [sic] more?
OPERATOR: What?
PUGH: Do you want me to go out there and see him so he can beat me up some more?
Id. The operator said "no" and repeated the question whether Bridgette Pugh could see Timothy Pugh from where she was. Bridgette responded that "he's outside of the house." Id. at 220. She answered "yes" when asked if there was a restraining order in place and, when asked if Mr. Pugh had been drinking, answered "that's all he ever does." Id. The operator inquired about injuries and then again asked, "And you can no longer see him, correct?" Id. at 221. Mrs. Pugh replied, "Yes," and clarified "I can not." Id. The call terminated when police officers arrived. When the officers arrived, Bridgette Pugh had a bruised face and a chipped tooth. The officers soon arrested Mr. Pugh in the parking lot outside the apartment where Bridgette was.
¶ 3 Mr. Pugh was charged with one count of domestic violence, felony violation of a court order. He was also charged with two *895 misdemeanor counts of violation of the protection order and witness tampering. These additional counts arose out of phone calls that Pugh made to Bridgette after he was confined in the King County Jail. The felony charge was severed from the other counts, with two separate trials resulting. The first trial involved the charges for witness tampering and misdemeanor violations of the protection order. Pugh was convicted of all of these counts.
¶ 4 At the second trial, the 911 tape was admitted as an excited utterance under ER 803(a)(2). Officer Michael Meissner, who responded to the 911 call, testified that he was dispatched at 3:15 a.m. to a domestic violence call. He arrived at 3:17 a.m. and found Mrs. Pugh obviously upset and crying. He testified she was bruised and had a chipped tooth. He took a recorded statement and photographs of Bridgette's injuries. Meissner testified that medics also arrived at the apartment and treated her. He testified that as he was leaving the building a man matching Pugh's description was coming toward him and Meissner called out "Timothy?" to which the man responded "yeah." Court Proceedings (July 28, 2005, before Honorable Theresa B. Doyle) at 31-32. Meissner immediately arrested Pugh.
¶ 5 The jury in the second trial also heard portions of the phone calls that Mr. Pugh made from the jail in which he urged Bridgette Pugh not to testify. These calls include Pugh's acknowledgments of his assault on her. Although the State had delivered a subpoena to Mrs. Pugh at her Auburn address, she did not comply with the subpoena and did not appear at trial as a witness. Pugh was convicted of felony violation of the court order, domestic violence.
¶ 6 Mr. Pugh appealed both verdicts, arguing that the witness tampering conviction was unconstitutional because he was charged with two alternative means of committing the crime but the jury was instructed as to three. The Court of Appeals reversed this conviction and it is not at issue at the present stage of the proceedings. Pugh also argued that admission of the 911 tape at his felony trial violated the confrontation clauses of the state and federal constitutions. The Court of Appeals rejected these claims and affirmed his conviction for domestic violence, felony violation of a protection order. State v. Pugh, noted at 139 Wash.App. 1079, 2007 WL 2171361.

ANALYSIS

Sixth Amendment
¶ 7 Mr. Pugh contends that admission of the 911 tape violated his right to confrontation under the Sixth Amendment. He maintains that the statements made to the 911 operator were testimonial and he had no prior opportunity to cross-examine Bridgette regarding them.
¶ 8 The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The confrontation clause "applies to `witnesses' against the accused-in other words, those who `bear testimony.'" Crawford v. Washington, 541 U.S. 36, 51, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (citation omitted). It "bars `admission of testimonial statements of a witness who did not appear at trial unless' the witness `was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" Davis v. Washington, 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (quoting Crawford, 541 U.S. at 53-54, 124 S.Ct. 1354). Nontestimonial hearsay, on the other hand, is admissible under the Sixth Amendment subject only to the rules of evidence. Davis, 547 U.S. at 821, 126 S.Ct. 2266.
¶ 9 As the Court explained in Davis, statements made in the course of a police interrogation are nontestimonial if they were made under circumstances objectively indicating that the primary purpose of interrogating the speaker was "to enable police assistance to meet an ongoing emergency." Id. at 822, 126 S.Ct. 2266. But they are testimonial if circumstances "objectively indicate that there [wa]s no such ongoing emergency" and "the primary purpose of the interrogation [wa]s to establish or prove past *896 events potentially relevant to later criminal prosecution." Id.
¶ 10 The Court adopted four factors that help to determine whether the primary purpose of police interrogation is to enable police assistance to meet an ongoing emergency or to establish or prove past events: (1) whether the speaker is speaking of events as they are actually occurring or instead describing past events; (2) whether a reasonable listener would recognize that the speaker is facing an ongoing emergency; (3) whether the questions and answers show that the statements were necessary to resolve the present emergency or instead to learn what had happened in the past; and (4) the level of formality of the interrogation. Id. at 827, 126 S.Ct. 2266.
¶ 11 In applying these factors in Davis, one of the two consolidated cases before it, the Court found the 911 call was nontestimonial because the victim's statements were made about events as they were actually occurring, a reasonable listener would recognize that she was facing an ongoing emergency, the call was a cry for help in the face of a physical threat, and the environment was chaotic and probably unsafe. Id. at 827-28, 126 S.Ct. 2266. The Court also explained that the statements in Davis were taken while the declarant was alone, unprotected by police, in apparent immediate danger from the defendant, and seeking aid, not relating past events. Id. at 831-32, 126 S.Ct. 2266. In contrast, in the second case before the Court, Hammon,[2] the Court found that statements made to police officers after they arrived were testimonial because the purpose of the interrogation was to investigate a possible crime where there was no immediate threat and no emergency in progress, and the witness testified as to what had happened rather than what was happening. Id. at 829-30, 126 S.Ct. 2266.
¶ 12 Here, read out of context, some of Bridgette Pugh's statements appear to describe past events. For example, she said that "[m]y husband was beating me up really bad." CP at 215. She also said that he was walking toward the street and that she could not see him, indicating that she was no longer threatened by him. On the other hand, many of her statements during the call show that her overriding purpose in calling 911 was to obtain police assistance to ensure her safety and medical assistance for her injuries. Although she could not see Mr. Pugh, she expressed concerns about being beaten again if she went outside. She obviously thought he was still close by and remained a danger, and in fact he was arrested outside the apartment in the parking lot just as Officer Meissner was leaving the building.
¶ 13 A number of the 911 operator's questions and Mrs. Pugh's responses also indicate that responses were sought to resolve a present emergency, including questions about whether Pugh was armed, whether he had been drinking, and questions about his identity. The Court in Davis indicated that statements might be nontestimonial if police interrogation, objectively viewed, was an effort to establish an assailant's identity so that dispatched officers might know whether they would be encountering a violent felon. That appears to be the case here.
¶ 14 In addition, Bridgette Pugh said that she needed an ambulance, and this statement in conjunction with her statements that she had been beaten indicated a medical emergency requiring assistance.
¶ 15 We conclude that Mrs. Pugh's statements were nontestimonial and that no violation of the Sixth Amendment occurred given the back and forth, conflicting statements about Pugh's presence and the possible threat he posed, and Bridgette Pugh's request for an ambulance.

Article I, section 22
¶ 16 Bridgette Pugh's statements to the 911 operator were admitted as excited utterances under ER 803(a)(2). Mr. Pugh does not dispute that the statements constitute excited utterances within the meaning of the rule. But he contends that their admission violated his state confrontation right.
¶ 17 Mr. Pugh asks the court to independently interpret article I, section 22 and offers *897 two alternative interpretations. First, he urges that with regard to a complaining witness's "accusatory" statements, the statements are inadmissible unless the witness testifies or the defendant has had an opportunity to cross-examine the witness and the State demonstrates that the witness is unavailable. Alternatively, he suggests that a complaining witness's hearsay statements, of whatever kind, are inadmissible if the witness is absent from trial, unless the State demonstrates that the witness is unavailable to testify. Under either approach, he contends, his state right to confrontation was violated by admission of the 911 tape.
¶ 18 In Crawford, 541 U.S. at 68, 124 S.Ct. 1354, the Court observed that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States with flexibility in their development of hearsay lawas does Roberts,[[3]] and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." Thus, a state is free to follow its own law respecting hearsay statements that are nontestimonial.
¶ 19 Article I, section 22 provides that "[i]n criminal prosecutions, the accused shall have the right . . . to meet the witnesses against him face to face." Pugh engages in a Gunwall[4] analysis, arguing that the state constitution's confrontation clause should be given an interpretation independent of that given the Sixth Amendment's confrontation clause and that the state provision is more protective than the Sixth Amendment right. However, we have already concluded that an independent analysis applies. State v. Foster, 135 Wash.2d 441, 473, 481, 957 P.2d 712 (1998) (Alexander, J., concurring and dissenting; Johnson, J., dissenting); State v. Shafer, 156 Wash.2d 381, 391, 128 P.3d 87 (2006) (article I, section 22 is subject to an independent analysis with regard to both the scope of the confrontation right as well as the manner in which confrontation occurs[5]) (citing Foster, 135 Wash.2d at 470, 957 P.2d 712 (Guy, J., lead opinion), 471, 957 P.2d 712 (Alexander, J., concurring and dissenting), 481, 957 P.2d 712 (C. Johnson, J., dissenting)). Thus, a Gunwall analysis is no longer necessary.
¶ 20 The question instead is whether our state constitution precludes admission of the 911 tape. Construction of the state constitution is a question of law that is reviewed de novo. State v. Chenoweth, 160 Wash.2d 454, 462, 158 P.3d 595 (2007). In determining the meaning of a state constitutional provision, the "`focus is on whether the unique characteristics of the state constitutional provision and its prior interpretations actually compel a particular result.'" Id. at 463, 158 P.3d 595 (quoting City of Seattle v. McCready, 123 Wash.2d 260, 267, 868 P.2d 134 (1994)). We examine the constitutional text, the historical treatment of the interest at stake as disclosed by relevant case law and statutes, and the current implications of recognizing or not recognizing an interest. Id. at 463, 158 P.3d 595.
¶ 21 Turning first to the language of article I, section 22, read literally it would require that the "accused" "meet" the speaker "face to face." Because Bridgette Pugh was not present at the trial and Mr. Pugh had never had an opportunity to cross-examine her about the statement, his confrontation right was violated if a literal interpretation of the clause were to apply. Pugh relies on State v. Stentz, 30 Wash. 134, 142, 70 P. 241 (1902), abrogated on other grounds by State v. Fire, 145 Wash.2d 152, 34 P.3d 1218 (2001), for the proposition that article I, section 22's confrontation right guarantees the right to cross-examine the witness in open court in the presence of the accused.
¶ 22 But the state confrontation clause has not "been read literally, for to do so would result in eliminating all exceptions to the hearsay rule." State v. Ryan, 103 Wash.2d *898 165, 169, 691 P.2d 197 (1984). In Foster, we held that the state confrontation clause should not be construed literally to require a physical, face-to-face confrontation between the defendant and the speaker. Foster, 135 Wash.2d at 463-64, 957 P.2d 712 (plurality) (recognizing the clause is not to be read literally); id. at 474, 957 P.2d 712 (Alexander, J., concurring and dissenting) (article I, section 22 does not require in every circumstance "an eyeball-to-eyeball confrontation between witnesses and the accused"; such a view "is too rigid and inflexible"). Although the dissent in Foster relied on the same passage in Stentz that Pugh cites, id. at 486-87, 957 P.2d 712 (Johnson, J., dissenting), a majority of this court disagreed with this view of the state confrontation clause.
¶ 23 Further, hearsay statements have long been admitted under our state confrontation clause in cases where the defendant did not meet the declarant "face to face" and had no opportunity for cross-examination. Among these are early cases involving dying declarations, e.g., State v. Eddon, 8 Wash. 292, 36 P. 139 (1894); statements of coconspirators, e.g., State v. Payne, 10 Wash. 545, 39 P. 157 (1895), overruled in part by State v. Goodwin, 29 Wash.2d 276, 186 P.2d 935 (1947); and public records, e.g., State v. Bolen, 142 Wash. 653, 254 P. 445 (1927).
¶ 24 With regard to the historical treatment of statements like those made to the 911 operator, we note initially that "[t]he privilege of confrontation has at all times had its recognized exceptions, and these exceptions are not static, but may be enlarged from time to time if there is no material departure from the reason underlying the constitutional mandate guaranteeing to the accused the right to confront the witnesses against him." State v. Ortego, 22 Wash.2d 552, 563, 157 P.2d 320 (1945).[6] As mentioned, the 911 tape was admitted as an excited utterance.
¶ 25 The modern "excited utterance" exception to the hearsay rule arose out of the "res gestae" doctrine, which was recognized at the time our state constitution was adopted. Hearsay statements were frequently admitted under the "res gestae" exception notwithstanding the state constitution's confrontation clause. "Res gestae" "is a doctrine which recognizes that, under certain circumstances, a declaration may be of such spontaneous utterance that, metaphorically, it is an event speaking through the person, as distinguished from a person merely narrating the details of an event." Beck v. Dye, 200 Wash. 1, 10-11, 92 P.2d 1113 (1939) (summarizing numerous earlier cases). The theory underlying admissibility of statements under the res gestae doctrine was that "`[w]hat is said or done by participants under the immediate spur of a transaction becomes thus part of the transaction, because it is then the transaction that thus speaks. In such cases it is not necessary to examine as witnesses the persons who, as participators in the transaction, thus instinctively spoke or acted.'" State v. Aldrick, 97 Wash. 593, 596, 166 P. 1130 (1917) (quoting 1 FRANCIS WHARTON & O.N. HILTON, A TREATISE ON THE LAW OF EVIDENCE IN CRIMINAL ISSUES § 262 (10th ed.1912)). Res gestae statements "raise a reasonable presumption that they are the spontaneous utterances of thoughts created by or springing out of the transaction itself, and so soon thereafter as to exclude the presumption that they are the result of premeditation or design." Heg v. Mullen, 115 Wash. 252, 256, 197 P. 51 (1921) (internal quotations omitted). Cross-examination is unnecessary when the action speaks for itself.
¶ 26 The doctrine was well established at the time the state constitution was adopted. See generally, e.g., 1 SIMON GREENLEAF, A TREATISE ON THE LAW OF EVIDENCE 144-47 *899 (14th ed. 1883) (GREENLEAF ON EVIDENCE); THOMAS STARKIE, A PRACTICAL TREATISE OF THE LAW OF EVIDENCE 89 n. 1 (10th ed. 1876) (STARKIE ON EVIDENCE); 1 HORACE SMITH, ROSCOE'S DIGEST OF THE LAW OF EVIDENCE IN CRIMINAL CASES 40 n. 1 (8th ed. 1888) (ROSCOE'S CRIMINAL EVIDENCE); FRANCIS WHARTON, A TREATISE ON THE LAW OF EVIDENCE IN CRIMINAL ISSUES §§ 262-271, at 192-203 (9th ed. 1884) (WHARTON ON EVIDENCE). Greenleaf's evidence treatise summarizes two main inquiries under the doctrine: "whether the circumstances and declarations offered in proof were contemporaneous with the main fact under consideration, and whether they were so connected with it as to illustrate its character." GREENLEAF ON EVIDENCE, supra, § 108, at 144-45.[7]
¶ 27 The res gestae doctrine was applied in State v. Smith, 26 Wash. 354, 67 P. 70 (1901), where statements of a robbery victim made almost immediately after the robbery were admissible as res gestae. See also State v. Freidrich, 4 Wash. 204, 214, 29 P. 1055 (1892) (referring to res gestae as a general rule of evidence). Although the decision in Beck was issued years later than Smith and Freidrich, the court in Beck summarized earlier cases when it set out the essential requirements of the res gestae rule:
(1) The statement or declaration made must relate to the main event and must explain, elucidate, or in some way characterize that event; (2) it must be a natural declaration or statement growing out of the event, and not a mere narrative of a past, completed affair; (3) it must be a statement of fact, and not the mere expression of an opinion; (4) it must be a spontaneous or instinctive utterance of thought, dominated or evoked by the transaction or occurrence itself, and not the product of premeditation, reflection, or design; (5) while the declaration or statement need not be coincident or contemporaneous with the occurrence of the event, it must be made at such time and under such circumstances as will exclude the presumption that it is the result of deliberation, and (6) it must appear that the declaration or statement was made by one who either participated in the transaction or witnessed the act or fact concerning which the declaration or statement was made.
Beck, 200 Wash. at 9-10, 92 P.2d 1113.
¶ 28 Pugh contends, however, that the excited utterance exception did not come into existence until too long after the constitution was adopted for it to have been within the contemplation of the framers, and that it is so different from the res gestae exception that the fact the res gestae exception was recognized early on is not sufficient to demonstrate that excited utterances would have been admitted despite the state confrontation clause. The difference, he maintains, is that the "res gestae" exception is more restrictive than the excited utterance exception because excited utterances do not have to be contemporaneous with the event, citing State v. Dixon, 37 Wash.App. 867, 873, 684 P.2d 725 (1984).
¶ 29 The res gestae doctrine evolved into several present day hearsay exceptions, usually identified as the present sense impression, the excited utterance, and statements of present bodily condition, mental states, and emotions. 2 KENNETH S. BROUN, McCORMICK ON EVIDENCE § 268, at 245-46 (6th ed.2006). Thus, contrary to Pugh's argument, "excited utterances" did come within the res gestae exception at the time the state constitution was adopted, provided they met the standards laid out in Beck.[8]
*900 ¶ 30 Also contrary to Pugh's argument, in this state the res gestae exception did not require that the statements always had to be exactly contemporaneous with the occurrence of the event. In one case, for example, a witness testified about statements made nearly two hours after a train wreck by a man injured in the wreck that related to its cause. The hearsay statements were objected to because of the passage of time. This court upheld admission of the testimony under the res gestae exception, stating that "it is not always essential to . . . admissibility that the declarations and principal occurrence shall be identical in point of time" and explaining that exact concurrence of the statements or admissions and the principal act is not required "if they arise naturally therefrom, without evidence of premeditation, and directly tend to characterize or explain it." Walters v. Spokane Int'l Ry. Co., 58 Wash. 293, 297-98, 108 P. 593 (1910).
¶ 31 Thus, the Washington court was more concerned with whether the rationale underlying the res gestae doctrine was satisfied than on rigid adherence to strict contemporaneousness. Walters accords with the 1883 Greenleaf treatise, which states that while some decisions showed strict adherence to a rule of contemporaneousness, "the current of decisions, in the United States at least, is to admit such declarations if they are so connected with a fact in issue as to qualify, or characterize, or explain it, although not strictly contemporaneous with it." GREENLEAF ON EVIDENCE, supra, at 145 n.(a). Other treatises of the time made the same point. E.g., ROSCOE'S CRIMINAL EVIDENCE, supra, at 42 n. 1 (the declarations "must be contemporaneous with the main fact" but they need not be "precisely concurrent in point of time"; rather, "[i]f they spring out of the transaction, elucidate it, are voluntary and spontaneous, and make at a time so near to it as reasonably to preclude the idea of deliberate design, they are then to be regarded as contemporaneous"); STARKIE ON EVIDENCE, supra, at 89 n. 1 (same). But see, e.g., WHARTON ON EVIDENCE, supra, § 262, at 194.
¶ 32 Pugh argues that a statement in response to a question could not fall under the traditional exception for res gestae, however, and therefore the statements made by Bridgette Pugh in response to the 911 operator's questions do not qualify under the res gestae rule. The traditional exception for res gestae in this state did encompass responses to questions, however. In State v. Labbee, 134 Wash. 55, 58, 234 P. 1049 (1925), the court concluded that a statement made by the declarant within 15 to 20 minutes after the event, even though in response to a question was spontaneous and instinctive, and "was clearly a part of the res gestae."
¶ 33 Mr. Pugh maintains that at the time the state constitution was adopted, the res gestae doctrine was not recognized by this court, although by 1917 it was recognized by the court. For several reasons, we disagree. First, Smith, addressed above, was decided in 1901. Second, the authority Pugh cites does not support his conclusion. Mr. Pugh relies on State v. Hunter, 18 Wash. 670, 672, 52 P. 247 (1898), for the proposition that this court did not recognize the doctrine at the time the constitution was adopted. He claims that the court in Hunter held that statements made to a child rape victim "immediately, or at least within an hour, after the assault" were admissible only as to the fact of the complaint, but that anything beyond this would be "hearsay of the most dangerous character." Id.
¶ 34 Although the quoted words appear in the opinion, Mr. Pugh mischaracterizes the case. The court actually said that it was not error "to permit the mother to testify that the prosecutrix made complaint to her immediately, or at least within an hour, after the assault was committed." Id. This is an application of a particular rule that applied in rape cases and permitted admission of evidence of the fact that the victim made a complaint right after the attack occurred. See generally Roscoe's Criminal Evidence, *901 supra, at 41-45. The fact that a complaint was made was considered to be original evidence, not hearsay. Id. As this court explained, the law required that there be corroboration of the testimony of a rape victim, which could be established through the testimony of the victim or another witness that she made a complaint shortly after the commission of the alleged offense, and where, when, and to whom the complaint was made. State v. Holcomb, 73 Wash. 652, 656, 132 P. 416 (1913).
¶ 35 As a separate matter, a rape victim's statements giving additional detail might be admissible if they were made immediately after the crime and fell within the res gestae exception. Id.; see, e.g., State v. Beaudin, 76 Wash. 306, 307, 136 P. 137 (1913) (it was proper to permit the mother to testify that the complaint was made by her very young daughter, but error to permit her to repeat the child's statements, "there being no contention that the" child's statements "were any part of the res gestae"). But in Hunter the res gestae doctrine simply was not implicated by the mother's testimony as described by the court, and it is therefore not surprising that the court did not discuss the doctrine. Contrary to Pugh's contention, it is incorrect to conclude based on Hunter that this court did not recognize the res gestae rule at the time the constitution was adopted.
¶ 36 Finally, as explained, the res gestae doctrine was widely and well established at the time our state constitution was adopted.
¶ 37 Mr. Pugh contends, though, that after Washington courts began to admit res gestae statements, courts and litigants expected that either the witness would testify at trial or be genuinely unavailable for trial. He relies on three cases. In State v. Hazzard, 75 Wash. 5, 23, 134 P. 514 (1913), statements made by the testifying witness's sister, who was deceased at the time of trial, were admitted as res gestae statements. In State v. Ripley, 32 Wash. 182, 190-91, 72 P. 1036 (1903), res gestae statements of a prosecution witness who testified at trial were admitted (evidence showed the witness had been drinking and had been knocked unconscious, and made the statements after he regained consciousness). Finally, in Smith, the witness whose statements were admitted as res gestae statements was mentally incompetent at the time of trial.
¶ 38 However, these cases simply do not support Mr. Pugh's claim. It is true that the declarants in these cases were either unavailable or testified at trial, but in none of these cases did the court address the issue of availability of the declarant. Given widespread acceptance at the time of the reliability of res gestae statements without any need for cross-examination, it is completely understandable that this court did not address availability of the declarants.
¶ 39 The statements made by Bridgette Pugh to the 911 operator fall within the res gestae doctrine as it existed when our state constitution was adopted. See Beck, 200 Wash. at 9-10, 10-11, 92 P.2d 1113. They were natural statements growing out of the assault on her, not merely a narrative of what had happened, and they explained events that had occurred within minutes as well as present and continuing circumstances. They were statements of fact, not opinion. They were spontaneous utterances dominated and evoked by the events themselves without premeditation or reflection. They were made at a time and under circumstances that exclude any presumption, based on passage of time, that they were the result of deliberation. They were made by a participantthe victimof the transactions described. Accordingly, Mrs. Pugh's statements are of a type that simply do not implicate the right to confrontation under article I, section 22.
¶ 40 Moreover, the interpretations of article I, section 22 offered by Mr. Pugh are flawed. The first alternative would require a determination of whether the statement at issue is a complaining witness's "accusatory statement." Although Pugh provides little explanation, this approach obviously requires a threshold determination of whether statements are "accusatorial," which Pugh says means that the declarant is asserting the defendant has committed a crime. According to Pugh, this threshold determination also involves an inquiry into the importance of the statement and its role in the case. In short, a "pretrial" would be necessary to *902 determine how the evidence would be used and what its effect would be at trial. Pugh also says that when the State seeks to admit accusatorial hearsay statements of a complaining witness, either the witness must testify or the State must demonstrate the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness.
¶ 41 Thus, despite the reliability attached to statements that were res gestae, under Pugh's first proposed alternative excited utterances coming within the traditional res gestae doctrine would be inadmissible without cross-examination. This is a marked departure from prior law under our state constitution. There is simply no support for this approach in this state's historical treatment of res gestae and excited utterances.
¶ 42 Mr. Pugh's second proposed interpretation is that the court hold that hearsay statements of any kind are inadmissible under article I, section 22 unless the State establishes the witness is unavailable to testify. The foundation for this approach is in other state courts' holdings that Pugh describes as establishing a preference for live testimony while safeguarding the right to confrontation and recognizing the need to yield to necessity in some cases.
¶ 43 Pugh is essentially saying that all hearsay implicates the state confrontation clause and that once implicated, the state has to show unavailability of the witness. His second alternative approach therefore also rejects the theory that spontaneous statements coming within the historical contours of the res gestae doctrine are inherently reliable. This goes far beyond anything this court has ever held and beyond what the United States Supreme Court requires now or required even before Crawford. Pugh does not explain how a confrontation rule encompassing all hearsay comports with the law of this state, most likely because there is no basis for this approach in state law.
¶ 44 Our law has long been that res gestae statements, as delineated early in our state history, do not come within the protection of the state confrontation clause.
¶ 45 Finally, we need not address the question whether excited utterances admissible under ER 803(a)(2) are, ipso facto, constitutionally admissible under article I, section 22. We have reservations about the matter, given that the modern excited utterance exception to the hearsay rule appears, in some instances, to have expanded beyond its historical antecedents. See, e.g., State v. Thomas, 150 Wash.2d 821, 853-55, 83 P.3d 970 (2004) (court held that the declarant was still under the stress of the excitement caused by a murder and the excited utterance exception applied, where the declarant's statements were made one and one-half hour after the murder and in the intervening time the declarant helped dispose of the body and burglarize the victim's house, and had traveled to another city where the van in which the murder occurred was burned).

CONCLUSION
¶ 46 Mrs. Pugh's statements to the 911 operator were nontestimonial, and therefore admission of a recording of the 911 call at Mr. Pugh's trial did not violate his right to confrontation under the Sixth Amendment. The statements qualify as res gestae under the res gestae doctrine as it applied at the time the state constitution was adopted. Statements of this type do not implicate the state confrontation clause. Because the statements are nontestimonial and do not implicate article I, section 22, admission of the 911 recording violated neither the federal nor the state confrontation clause.
¶ 47 The Court of Appeals is affirmed.
WE CONCUR: GERRY L. ALEXANDER, C.J., CHARLES W. JOHNSON, SUSAN OWENS, MARY E. FAIRHURST and JAMES M. JOHNSON, JJ.
CHAMBERS, J. (concurring).
¶ 48 I concur with the majority largely because I agree that "we need not address the question whether excited utterances admissible under ER 803(a)(2) are, ipso facto, constitutionally admissible under article I, section 22." Majority at 902. I believe the statements before us pass constitutional muster. *903 I write separately because I have serious reservations about the broadest applications of the excited utterance rule being made in the wake of Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
¶ 49 First, I agree that because we have already held that article I, section 22 is interpreted independently of the Sixth Amendment, a Gunwall[1] analysis is not a precondition to considering Timothy Pugh's state constitutional challenge. See State v. Foster, 135 Wash.2d 441, 473, 481, 957 P.2d 712 (1998) (Alexander, J., concurring and dissenting; C. Johnson, J., dissenting); accord State v. Shafer, 156 Wash.2d 381, 391, 128 P.3d 87 (2006). But I wish to emphasize that a Gunwall analysis is always helpful when we are first asked to decide whether a provision of our state constitution provides greater protection to individual liberty than its federal counterpart. The Gunwall factors are the best analytical framework this court has for determining how and why the state constitution may offer protections different from the federal constitution. In my view, unless we have already specifically so held, anyone wishing to seriously argue that a provision of the Washington Constitution has a different application than the United States Constitution would be wise to brief the Gunwall factors.[2]
¶ 50 Next, I agree with the majority that the excited utterance exception stems from the "res gestae" doctrine recognized at the time our state constitution was adopted. But those doctrines have evolved into two distinct concepts with differing rationales. Although hearsay statements have historically been admitted on the theory that they were part of the res gestae, that rule is more than a simple hearsay exception. One often cited commentator around the time our state constitution was adopted defined the term as "events speaking for themselves, through the instinctive words and acts of participants, not the words and acts of participants when narrating the events." FRANCIS WHARTON, A TREATISE ON THE LAW OF EVIDENCE IN CRIMINAL ISSUES §§ 262, at 192 (9th ed. 1884). It encompasses every act forming the main event at issue, not just statements made at the time. Unfortunately, courts have used the doctrine as a wastebasket catchall to admit any evidence that could be said to have arisen out of the event or transaction itself. See State v. Ripley, 32 Wash. 182, 190-91, 72 P. 1036 (1903) (admitting out-of-court statements made by prosecution's witness after robbery occurred because statements were deemed part of the res gestae). The broad and unrefined use of the doctrine has earned the criticism of some commentators. See Black's Law Dictionary 1423 (9th ed.2009) (quoting John H. Wigmore, A Students' Textbook of the Law of Evidence 279 (1935)) ("`[I]ts indefiniteness has served as a basis for rulings where it was easier for the judge to invoke this imposing catchword than to think through the real question involved.'").
¶ 51 While res gestae was accepted at the time our constitution was adopted, the excited utterance exception, as a separate concept, was not. While admissibility of res gestae evidence is premised upon the fact that the evidence arises out of the event itself, the admissibility of an excited utterance is now premised on the age old belief that the declarant has not had an opportunity to fabricate following a startling event. ROBERT H. ARONSON, THE LAW OF EVIDENCE IN WASHINGTON § 803.04[3][a] at 803-27 (4th ed.2008). But cf. United States v. Napier, 518 F.2d 316, 317-18 (9th Cir.1975) (affirming admission of an excited utterance spoken seven weeks after incident when victim became agitated after seeing a picture of the defendant); Aviva Orenstein, "MY GOD!": A Feminist Critique of the Excited Utterance Exception to the Hearsay Rule, 85 CAL. L.REV. 159 (1997) (questioning factual assumption underlying the excited utterance exception in light of modern psychology). It was John Henry Wigmore who advocated that "the spontaneous utterance exception should be unmoored from res gestae" and "that people are physically incapable of lying *904 when they are under great stress." Josephine Ross, Crawford's Short-lived Revolution: How Davis v. Washington Reins in Crawford's Reach, 83 N.D. L.REV. 387, 402 (2007). Unlike res gestae, excited utterances are an exception to the hearsay rule premised not on the fact that they form some part of the event itself but upon the belief that statements made pursuant to some startling event are inherently reliable. The excited utterance rule has become a broad exception based on the notion that people cannot lie when they are startled. I have serious doubts as to the reliability of that assumption.
¶ 52 For these reasons, I have reservations about whether the broadest applications of our excited utterance exception, based upon current assumptions of reliability, pass scrutiny under article I, section 22. However, having read numerous opinions by this court around the time of the adoption of our constitution, I am persuaded that the statements before us would have been admitted under the res gestae doctrine as it was then understood. Bridgette Pugh was seeking help and called 911. She started by exclaiming, "[m]y husband was beating me up really bad." Clerk's Papers (CP) at 315. When questioned further she said, "He's beatin' me up (unintelligible)." CP at 319. She said she needed an ambulance and when asked if she could still see her husband from where she was she responded, "Do you want me to go out there and see him so he can beat me up some more?" Id. These statements naturally arose out the event itself and form part of the res gestae as the term was historically understood. The statements made by Bridgette Pugh can be admitted under the res gestae doctrine.
¶ 53 Finally, I agree with the majority's analysis of the Sixth Amendment. I again wish to emphasize that when a court assesses out-of-court statements to determine if they are testimonial, the court should focus on the purpose of the person asking the questions, not on the declarant's purpose in making the statements. See State v. Ohlson, 162 Wash.2d 1, 20, 168 P.3d 1273 (2007) (Chambers, J., concurring) (noting a shift in focus from the Supreme Court's decisions in Crawford, 541 U.S. at 52, 124 S.Ct. 1354 and Davis v. Washington, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006)). Understanding this shift is important because when assessing the admissibility of a 911 call, the caller's purpose is often solely to seek help for an emergency. On the other hand, the person responding to the call may be more focused on information gathering than on responding to the emergency. The purpose of the questions is, of course, only one of the factors to be considered when determining whether a statement is testimonial. Ohlson, 162 Wash.2d at 22, 168 P.3d 1273 (Chambers, J., concurring).
¶ 54 With these observations, I concur with the majority.
WE CONCUR: DEBRA L. STEPHENS, J.
SANDERS, J. (dissenting).
In criminal prosecutions the accused shall have the right . . . to meet the witnesses against him face to face. . . .
CONST. art. I, § 22.
¶ 55 What is there about "face to face" that the majority doesn't understand? "The beginning of wisdom is calling things by their right names."[1]
¶ 56 Timothy Pugh was convicted of domestic violence, felony violation of a court order, based upon the contents of a 911 tape, not a live witness who could be confronted and cross-examined "face to face." If the majority can disregard constitutional text so clear on its face, it amends the constitution by judicial fiat. This undermines the very purpose of a written constitution to define the responsibility of government and the rights of the people in a manner that may be changed only by the people themselves acting through the amendment process. Moreover, the majority does similar violence to the Sixth Amendment right of an accused "to be confronted with the witnesses against him." U.S. CONST. amend. VI. See Crawford v. Washington, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

*905 Article I, Section 22
¶ 57 The majority concedes some modern hearsay exceptions may not be admissible under article I, section 22. But the majority's interpretation of our confrontation clause eliminates any possibility of broader protection, even while it purports to leave the issue open. Moreover, the majority's historical analysis is misplaced, fails to give a plain meaning to the plain text of our constitution, and misconstrues precedent.
¶ 58 This provision could not be clearer: "In criminal prosecutions, the accused shall have the right . . . to meet the witnesses against him face to face." Const. ART. I, § 22. We have previously determined an independent analysis of our confrontation clause is warranted. State v. Foster, 135 Wash.2d 441, 473, 481, 957 P.2d 712 (1998) (Alexander, J., concurring in part, dissenting in part; C. Johnson, J., dissenting); State v. Shafer, 156 Wash.2d 381, 391, 128 P.3d 87 (2006). The majority thus correctly turns to the text of our constitution and the law in place at the time of its ratification. Yet here the majority soon goes astray.
¶ 59 The text of our constitution is clear. Article I, section 22 states whom the defendant in a criminal case is entitled to meet the "witnesses against him"  and how he is entitled to meet them"face to face." Our early cases construed this requirement in accordance with its plain language: "[t]his means that the examination of such a witness shall be in open court, in the presence of the accused, with the right of the accused to cross-examine such witness as to facts testified to by him. . . ." State v. Stentz, 30 Wash. 134, 142, 70 P. 241 (1902), abrogated on other grounds by State v. Fire, 145 Wash.2d 152, 34 P.3d 1218 (2001). But the majority nevertheless argues the clause must not be read literally, for to do so would eliminate all hearsay exceptions. Majority at 897-98. However if a hearsay exception conflicts with our constitution, this court simply has no authority to choose the exception over the constitution.
¶ 60 Our constitution proclaims, "[w]e, the people of the State of Washington . . . do ordain this constitution." CONST. pmbl. It is the people who ratified our constitution, and "the constitution is the expression of the people's will, adopted by them." State ex rel. Albright v. City of Spokane, 64 Wash.2d 767, 770, 394 P.2d 231 (1964) (emphasis added). Therefore in analyzing the constitutional text "the intent to be determined is that of the people who ratified the document rather than the intent of the handful of men who wrote it." Robert F. Utter, Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights, 7 U. PUGET SOUND L.REV. 491, 511 (1984). Thus, "[a]ppropriate constitutional analysis begins with the text and, for most purposes, should end there as well." Malyon v. Pierce County, 131 Wash.2d 779, 799, 935 P.2d 1272 (1997).
¶ 61 But our majority takes exactly the opposite approach. It looks not to the intent of the people who ratified our constitution in 1889, best illuminated by its text, but the res gestae exception to the hearsay rule of evidence as it was at the time.[2] Presumably the majority believes if those who wrote the constitution were aware of res gestae as a rule of evidence, they must have intended to subordinate the clear text to it. But the people did not ratify the res gestae doctrine. The people ratified just the opposite, a text so plain its meaning is unmistakable. Admittedly, the meanings of words may change. Thus we might rightfully "inquire about the accepted meaning of the words at the time the provision was adopted," Utter, supra, at *906 509 (citing State v. Brunn, 22 Wash.2d 120, 139, 154 P.2d 826 (1945)), because "[c]onstitutions being the result of the popular will, the words used therein are to be understood ordinarily in the sense that such words convey to the popular mind," State ex rel. State Capitol Comm'n v. Lister, 91 Wash. 9, 14, 156 P. 858 (1916). But it hardly seems necessary to examine whether the popular meaning of "face to face" has changed over the past hundred-odd years. A textual analysis "includes the words themselves, their grammatical relationship to one another, as well as their context." Malyon, 131 Wash.2d at 799, 935 P.2d 1272. Thus we repair to the words, grammar, and context of our confrontation clause, rather than the subtleties of an obscure evidence rule relating to res gestae.
¶ 62 Webster's Third New International Dictionary 812 (2002) defines "face-to-face" as "within each other's sight or presence: involving close contacts: in person face-to-face meeting of the two leaders> face-to-face for the first time>." Nearly 150 years earlier, Webster's Unabridged Dictionary defined "`face,' in part, as `face to face; when both parties are present; as to have accusers face to face.'" State v. Foster, 135 Wash.2d 441, 483, 957 P.2d 712 (1998) (C. Johnson, J., dissenting) (quoting WEBSTER'S UNABRIDGED DICTIONARY 431 (1853)). As expected, the definition has not much changed in the past century and a half. The key to meeting "face to face" is presence. It cannot be otherwise if we are speaking English.
¶ 63 The context of the confrontation clause demands the same result. Article I, section 22 is titled "Rights of the Accused." CONST. art. I, § 22. It begins, "the accused shall have the right. . . ." Id. The rights of the accused are then delineated, one after another. Nothing modifies the listed rights. There are no caveats. Among these rights of the accused is the right "to meet the witnesses against him face to face." Only one possible conclusion can be drawn: criminal defendants have the right to stand in the physical presence of the witnesses against them and look them in the eye.
¶ 64 At least since 1902 our case law has been consistent with the popular understanding: a face to face meeting means physical presence. See Stentz, 30 Wash. at 142, 70 P. 241. Even earlier, this court in 1894 observed that dying declarations admitted at trial were "in practical conflict with the constitutional right of the defendant to meet the witnesses, that testify against him, face to face and . . . in conflict with his right to cross examine such witnesses." State v. Eddon, 8 Wash. 292, 297, 36 P. 139 (1894). Thus Eddon also recognized that physical presence was indeed the literal meaning of the clause notwithstanding "on the ground of necessity" the declaration was admitted given the defendant silenced the witness by homicide.[3]Id.
¶ 65 All cases cited by the majority for the proposition that we have never read the clause literally are inapposite. In Eddon the court expressly stated that the confrontation clause is inconsistent on its face with dying declarations. It did not concern res gestae.[4]
¶ 66 The other cases cited by the majority are equally inapposite. State v. Payne held certain statements made by the defendant and others charged with him prior to the commission of the crime were admissible. 10 *907 Wash. 545, 549-50, 39 P. 157 (1895), overruled in part by State v. Goodwin, 29 Wash.2d 276, 186 P.2d 935 (1947). But the opinion in Payne is entirely ambiguous regarding who exactly made the statements, who testified to them, and who was or was not present in the courtroom at the time. Id. Moreover, neither the federal confrontation clause nor the state confrontation clause is mentioned anywhere in the opinion. Id. at 548-55, 39 P. 157. Payne simply did not address the issue of confrontation.
¶ 67 State v. Bolen, 142 Wash. 653, 658, 254 P. 445 (1927) held military records containing the fingerprints of a murder victim whose head was missing were admissible to show identity of the victim. The court held this documentary evidence was not subject to the confrontation clause. Id. at 663-64, 254 P. 445. The majority's use of this case as an example is not well taken.
¶ 68 The majority also contends that State v. Ortego, 22 Wash.2d 552, 157 P.2d 320 (1945), shows this court's willingness to expand exceptions to the confrontation right. Majority at 898. We did state in Ortego that exceptions to the privilege of confrontation "may be enlarged from time to time if there is no material departure from the reason underlying the constitutional mandate guaranteeing to the accused the right to confront the witnesses against him." Ortego, 22 Wash.2d at 563, 157 P.2d 320 (citing Snyder v. Commonwealth of Massachusetts, 291 U.S. 97, 107, 54 S.Ct. 330, 78 L.Ed. 674 (1934), overruled in part on other grounds by Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)). But here the reason for the confrontation clause would be defeated by allowing hearsay. Moreover the actual holding of the case belies the apparent radicalism of the quotation. Ortego ruled that parol evidence of testimony of an unavailable witness was admissible, but only where the witness had already testified to the matter at a former trial, and "the accused was present and had an opportunity for cross-examination." Id. at 564, 157 P.2d 320 (emphasis added). This is indeed the underlying reason for our confrontation clause, and it is precisely this right to a face to face meeting, so the accused may cross examine the witness, that the majority's holding ignores.
¶ 69 Finally, none of the cited cases applying the res gestae doctrine in Washington arises under our confrontation clause. Hearsay exceptions developed through the laws of evidence are not necessarily exceptions to the confrontation clause. The United States Supreme Court in Crawford recognized this distinction, rejecting the view that the confrontation clause's application to out-of-court statements "depends upon `the law of Evidence for the time being.'" Crawford, 541 U.S. at 50-51, 124 S.Ct. 1354 (quoting 3 JAMES WIGMORE, EVIDENCE § 1397, at 101 (2d ed.1923)). Constitutional prescriptions are not subject to the "vagaries of the rules of evidence." Id. at 61, 124 S.Ct. 1354. Thus it is because hearsay exceptions are not confrontation clause exceptions that states are afforded "flexibility" in determining what effect their various confrontation clauses have on hearsay law. Id. at 68, 124 S.Ct. 1354. The common law of hearsay exceptions cannot abrogate a constitutional right, regardless of how often it has been applied in the past.
¶ 70 Moreover, "it does not appear that the judges who fashioned the modern exceptions gave much thought to the conflict between the new exceptions and the earlier understanding of the confrontation right." Thomas Y. Davies, Not "The Framers' Design": How the Framing-Era Ban Against Hearsay Evidence Refutes the Crawford-Davis "Testimonial" Formulation of the Scope of the Original Confrontation Clause, 15 J.L. & POL'Y 349, 452 (2007).[5] This observation is borne out by every case cited by the majority because not one of those cases so much as mentions confrontation in the context of res *908 gestae.[6]See State v. Labbee, 134 Wash. 55, 234 P. 1049 (1925); State v. Hazzard, 75 Wash. 5, 134 P. 514 (1913); State v. Ripley, 32 Wash. 182, 72 P. 1036 (1903); State v. Smith, 26 Wash. 354, 67 P. 70 (1901). The confrontation issue was never raised and thus never considered in any of these opinions. The judges deciding them indeed gave no thought to the conflict between the res gestae exception and the defendant's fundamental right to meet witnesses face to face. See Davies, supra, at 452. Rather they were concerned only with the law of evidence at the time. This narrow focus is confirmed by the authorities cited in the cases applying the res gestae doctrine. In Labbee, the court supported its ruling that statements were admissible as res gestae in part by citing Lucchesi v. Reynolds, 125 Wash. 352, 216 P. 12 (1923). Labbee, 134 Wash. at 59, 234 P. 1049. But Lucchesi was a civil case involving a car accident. 125 Wash. at 352, 216 P. 12. Another Washington criminal case that admitted statements as res gestae relied on Heg v. Mullen, 115 Wash. 252, 197 P. 51 (1921). State v. Goodwin, 119 Wash. 135, 139, 204 P. 769 (1922). As noted above, Heg was also a civil case. If we consider hearsay rules as exceptions to the right of confrontation, we allow the "vagaries of the rules of evidence" to trump the constitution. Crawford, 541 U.S. at 61, 124 S.Ct. 1354.
¶ 71 The people ratified our constitution. CONST. pmbl. The understanding of the ratifying public is thus the key to constitutional interpretation. Utter, supra, at 510. "Constitutions are not designed for metaphysical or logical subtleties. . . . The people make them; the people adopt them, the people must be supposed to read them, with the help of common sense; and cannot be presumed to admit in them any recondite meaning, or any extraordinary gloss." 1 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 451, at 322 (3d ed. 1858). Moreover, "if a constitutional provision is plain and unambiguous on its face, then no construction or interpretation is necessary or permissible." State ex rel. Anderson v. Chapman, 86 Wash.2d 189, 191, 543 P.2d 229 (1975) (emphasis added).
¶ 72 What could be plainer or more unambiguous than our confrontation clause? But the majority simply reads "face to face" out of our constitution. It is sadly not surprising that the majority refuses to follow the text, since elsewhere this court has opined, "`In the past, the plain meaning rule rested on theories of language and meaning, now discredited, which held that words have inherent or fixed meanings.'" Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wash.2d 1, 11, 43 P.3d 4 (2002) (quoting 2A NORMAN J. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 48A:16, at 809-10 (6th ed.2000)). The majority seems to adhere to its made up rule that a text can be "interpreted" in whatever way is most expedient to reach the desired result. This is nothing more than constitutional amendment by judicial fiat.
¶ 73 The only relevant questions here are whether Bridgette Pugh was a witness against her husband and whether, at his criminal trial, he met her face to face. The prosecutor at the trial told the jury that although Ms. Pugh "didn't come before you and testify . . . . that doesn't mean that you didn't hear her voice. That doesn't mean that she didn't tell you what happened to her." RP (7/29/05) at 7. The prosecutor was certainly correct. Bridgette Pugh was obviously a witness, indeed the principal witness, against the defendant. But she was not present. Read in the light of our face-to-face confrontation clause, these statements by a government prosecutor are telling. How could a constitutional violation be any clearer than this?

Sixth Amendment
¶ 74 "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . ." U.S. CONST. amend. VI. Hearsay evidence of a testimonial statement is thus inadmissible against a criminal defendant without showing both unavailability of the witness and a prior *909 opportunity for cross-examination. Crawford, 541 U.S. at 68, 124 S.Ct. 1354. Statements are testimonial "when the circumstances objectively indicate that there is no. . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Davis v. Washington, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Statements are not testimonial "when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." Id.
¶ 75 The Court in Davis examined several factors to determine whether a statement is objectively testimonial in the context of a 911 call. First, is the caller speaking about events as they were actually happening or describing past events? Second, would a reasonable listener recognize that the caller was facing an ongoing emergency? Third, was the nature of the interrogation, viewed objectively, such that the statements given were necessary to resolve the present emergency or to learn what had happened in the past? Finally, how formal was the interrogation? Id. at 827, 126 S.Ct. 2266.
¶ 76 The standard established in Davis is clearly based on objective criteria. Id. at 822, 827, 126 S.Ct. 2266. Yet the majority's analysis improperly focuses on the subjective intent of the caller, albeit obliquely. The caller's "overriding purpose in calling 911" is irrelevant. See majority at 896. The test is whether the circumstances objectively show (1) that there is or is not an ongoing emergency and (2) that the primary purpose of the interrogation is or is not to establish past events relevant to later criminal prosecution. Davis, 547 U.S. at 822, 126 S.Ct. 2266. Generalized statements about what the caller thought are mere speculation. See majority at 896. Rather, we must look objectively at what exactly was said in the call and determine on that basis whether or not it was testimonial.
¶ 77 First, this caller was speaking of past events, not events as they were actually happening. Davis, 547 U.S. at 827, 126 S.Ct. 2266. The majority claims that Bridgette Pugh's statements appear to describe past events if read out of context. Majority at 896. But the context to which the majority refers is elusive, since every statement Bridgette made regarding the incident not only appears to, but does, describe past events. The first statement made in the 911 call, and indeed the only statement the majority quotes directly throughout its entire analysis, is: "[m]y husband was beating me up really bad." Clerk's Papers (CP) at 215. In her next reference to the assault, Bridgette states, "[h]e fuckin' hit me as I was . . . he fuckin' hit me." CP at 216. She goes on to state, "[h]e fuckin' pushed me," "he was fuckin' pushin' me," "he pushed me off. . . .," and "I was outside."[7] CP at 218, 220, 221. The entire conversation with the 911 operator, viewed objectively, shows that the event described was in the past at the time of the 911 call.
¶ 78 Second, a reasonable listener would not recognize this situation as an ongoing emergency. The 911 operator's first question after verifying the address of the caller was, "[i]s he still there?" To this, Bridgette responded, "[n]o he's walking away." CP at 216. Moreover, it is apparent from the call that the husband was not even inside the house at the time of the incident:
OPERATOR: Is he living there with you?
PUGH: Nope.
OPERATOR: Did he force his way in or how did he get . . .
PUGH: I . . . I was outside.
CP at 220-21. A reasonable listener would discern from this exchange that whatever had happened had occurred outside the house altogether. Bridgette's husband was not a continuing threat but was walking away. The emergency was over.
¶ 79 Third, the objective nature of the interrogation in this case must be considered. The information gathered in the 911 call here, as in most such calls, includes information *910 relevant to prosecution, not simply resolution of the instant situation. The operator here established that there was "a restraining order in place," CP at 220, and asked whether the suspect had "force[d] his way in." CP at 221. While some of the information may have been relevant to aid police in resolving the situation, such as whether the suspect was present (he wasn't) and whether he had a weapon (he didn't), an objective line can be drawn between evidence-gathering and resolving the situation. This interrogation crossed that line. Finally, the formality of the interrogation also weighs against finding it was not testimonial, because 911 calls are commonly conducted according to a "script" composed by agents of investigating authorities. See State v. Davis, 154 Wash.2d 291, 310, 111 P.3d 844 (2005) (Sanders, J., dissenting), aff'd on other grounds by Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).
¶ 80 When all factors are considered together, the 911 call was testimonial. It described past events and could not reasonably be interpreted as an ongoing emergency. It was constitutional error to admit the call without a showing of unavailability and a prior opportunity to cross-examine. Crawford, 541 U.S. at 68, 124 S.Ct. 1354.
¶ 81 I dissent.
NOTES
[1] Bridgette's first name is used for clarity.
[2] The second case reviewed was Hammon v. State, 829 N.E.2d 444 (Ind.2005), rev'd on other grounds, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).
[3] Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).
[4] State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986).
[5] We found it unnecessary in Shafer to engage in an independent analysis, however, because the statute at issue had already been found constitutional under the state confrontation clause. Shafer, 156 Wash.2d at 391-92, 128 P.3d 87 (citing State v. Ryan, 103 Wash.2d 165, 169-70, 691 P.2d 197 (1984)).
[6] Although the court in Ortego cited a United States Supreme Court opinion for this proposition, it clearly meant that it applies under the state constitution because the court had already recognized in its opinion that the Sixth Amendment's confrontation clause was not then applicable to the states. Id. at 555, 157 P.2d 320; see also Pettit v. Rhay, 62 Wash.2d 515, 519, 383 P.2d 889 (1963) (also recognizing the federal provision had not been applied to the states by reason of the Fourteenth Amendment). In Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), the Court held that the Sixth Amendment guaranty of the right of the accused to confront the witnesses against him is a fundamental right that is made obligatory on the states by the Fourteenth Amendment.
[7] This court often relied on Greenleaf's evidence treatise in cases decided around the time Washington became a state. E.g., Eddon, 8 Wash. at 299, 36 P. 139 (with regard to what comes within the dying declaration hearsay exception); see also, e.g., Newman v. Buzard, 24 Wash. 225, 229-30, 64 P. 139 (1901); Dolan v. Scott, 25 Wash. 214, 218, 65 P. 190 (1901); Coey v. Darknell, 25 Wash. 518, 522-23, 65 P. 760 (1901); Mullen v. Sackett, 14 Wash. 100, 102, 44 P. 136 (1896) (describing Greenleaf as a "learned author"); Douthitt v. MacCulsky, 11 Wash. 601, 609, 40 P. 186 (1895) (describing rule "most admirably stated by Mr. Greenleaf"); Sayward v. Gardner, 5 Wash. 247, 253, 31 P. 761 (1892); Richmond v. Morford, 4 Wash. 337, 241, 30 P. 241 (1892).
[8] The principle underscoring admission of hearsay statements under the res gestae doctrine is the same as that underlying the excited utterance exception to the hearsay rule. In fact, the Judicial Council Comment to ER 803 states as to both the exception for present sense impression and excited utterance that the exception is consistent with previous Washington law, citing Beck v. Dye, 200 Wash. 1, 92 P.2d 1113. 5C KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW & PRACTICE § 803. 1, at 5 n. 3 (5th ed.2007). As pointed out, Beck summarized numerous earlier cases on the subject of statements admissible as res gestae. Both exceptions have long been, because of their character as spontaneous statements, considered to be reliable without the need for cross-examination.
[1] State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986).
[2] We may decline to decide a Gunwall issue if we determine it has been insufficiently briefed by the parties. State v. Wethered, 110 Wash.2d 466, 472, 755 P.2d 797 (1988).
[1] Ancient Chinese proverb.
[2] I take this opportunity to stand with a host of commentators pointing out the absurdity of the res gestae exception as frequently applied. Professor Wigmore criticizes the exception as "most frequently used merely as a cover for loose ideas and ignorance of principles." IA Wigmore on Evidence § 218, 1888 (Tillers rev. 1983). Bryan Garner, editor in chief of Black's Law Dictionary, lambastes the concept: "`The phrase is antiquated. By modern judges it is being gradually discarded. It is superfluous, and serves only to obscure the logic of the rules. It should be left to oblivion.'" BLACK'S LAW DICTIONARY 1423 (9th ed.2009) (quoting JOHN H. WIGMORE, A STUDENTS' TEXTBOOK OF THE LAW OF EVIDENCE 279 (1935)). "Res gestae is perhaps the most famousand certainly the hardiestjudicial nonreason of all time. It has enduredno, thrived uponmore than a century of abuse by both its detractors and its devotees." Jerome A. Hoffman, Res Gestae's Children, 47 ALA.L.REV. 73, 75 (1995) (emphasis omitted).
[3] Even if necessity is a legitimate consideration where murderers have put the witnesses "beyond the power of testifying by killing them," Eddon, 8 Wash. at 297, 36 P. 139, the rationale does not hold up where, as here, no act of the defendant made face-to-face testimony impossible. Moreover, the State's only effort to obtain Bridgette Pugh's testimony was a subpoena. Report of Proceedings (RP) (7/29/05) at 35-36. There is no evidence of any further attempts by the State to secure her as a witness. Id. The necessity of a dying declaration cannot be equated to a witness not showing up for trial. See State v. Rivera, 51 Wash.App. 556, 560, 754 P.2d 701 (1988) (prosecution's obligation to exercise good faith in attempting to procure witness's attendance not satisfied where prosecution's only effort was issuance of a subpoena).
[4] The words "res gestae" appear twice in Eddon, but the court does not make any analysis of the term, and certainly not in the context of the confrontation clause. Eddon, 8 Wash. at 294, 299, 36 P. 139. Its use of the term is not with regard to out-of-court statements, but a reference to the more general meaning of "a term describing acts and circumstances admitted into evidence because of their ability to shed light on a principal fact at issue. . . ." 29A Am.Jur.2d Evidence § 876 (2009).
[5] While Davies, supra, disagrees with the historical distinction between testimonial and nontestimonial statements made by the Court in Crawford, both are in agreement that the development of modern hearsay law bears little relationship to constitutional concerns. See Crawford, 541 U.S. at 51, 124 S.Ct. 1354; Davies, supra, at 452. As Crawford points out, "[l]eaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices." Crawford, 541 U.S. at 51, 124 S.Ct. 1354.
[6] Several of the cases cited are not criminal cases at all and are thus all the more irrelevant to confrontation rights. See Beck v. Dye, 200 Wash. 1, 92 P.2d 1113 (1939); Heg v. Mullen, 115 Wash. 252, 197 P. 51 (1921); Walters v. Spokane Int'l Ry. Co., 58 Wash. 293, 108 P. 593 (1910).
[7] While one statement was made in the present tense, that "[h]e's beatin' me up," CP at 219, it is this statement, not the others, that is out of context.