GORDON McCLOUD, J. (concurring)
*970 ¶47 I concur in the majority's analysis of federal constitutional law with two observations.
¶48 First, I note that the majority's analysis is limited to "the defendant's right of confrontation under the Sixth Amendment to the United States Constitution." Majority at 961; U.S. CONST. amend. VI. Theresa Scanlan failed to argue for a different outcome under article I, section 22 of the Washington State Constitution,[1] which we analyze independently from the federal constitution. State v. Lui, 179 Wash.2d 457, 468-70, 315 P.3d 493 (2014) ("This court has concluded that article I, section 22 merits an independent *774 analysis as to both the manner and the scope of the confrontation right." (citing State v. Pugh , 167 Wash.2d 825, 835, 225 P.3d 892 (2009) )); State v. Martin, 171 Wash.2d 521, 528-33, 252 P.3d 872 (2011) (conducting a Gunwall[2] analysis and concluding that an independent analysis of article I, section 22 was necessary); Pugh, 167 Wash.2d at 834-35, 225 P.3d 892 (stating that "a Gunwall analysis is no longer necessary" and independently analyzing article I, section 22 ). Whether article I, section 22 provides greater protections to defendants than the federal constitution in this context remains unanswered.
¶49 Second, I note that the United States Supreme Court has not "adopt[ed] a categorical rule excluding [statements to individuals who are not law enforcement officers] from the Sixth Amendment's reach." Ohio v. Clark, --- U.S. ----, 135 S. Ct. 2173, 2181, 192 L. Ed. 2d 306 (2015). Although "such statements are much less likely to be testimonial than statements to law enforcement officers," id., "the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony,' " id. at 2180 (alteration in original) (quoting Michigan v. Bryant, 562 U.S. 344, 358, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011) ).
¶50 In this case, however, I cannot say that the primary purpose of the statements at issue was to create an out-of-court substitute for trial testimony. This is particularly true of the statements made to Nurse Catherine Gay, Dr. Robert Britt, and social worker Jemima Skjonsby at the emergency room on the night of the incident. All three saw Leroy Bagnell in the informal, spontaneous setting of an emergency room shortly after his children discovered him nonresponsive in his home, majority at 961-62, and all three were primarily concerned with Bagnell's safety-they did not want to release him into a potentially dangerous situation, *775 id. at 962-63, 967-68. In this way, the situation at the emergency room is not unlike the situation at the school in Clark , where "the teachers needed to know whether it was safe to release [the child] to his guardian at the end of the day." 135 S. Ct. at 2181.
¶51 I am more concerned with Bagnell's statements to Dr. Curtis Endow, physician assistant Friel, and Dr. Jessica Pierce, which he made 7, 12, and 20 days after the incident, respectively. By the time Bagnell met with these three medical providers, he had signed multiple medical release forms authorizing police and prosecutors to obtain his medical records "in furtherance of the investigation and any resulting prosecution." Majority at 962, 967-68; Pet'r's Suppl. Br., App. A. The forms also authorized his "care providers" to "discuss [his] medical condition and any treatment with the assigned detective, his/her designee, and the prosecuting attorney." Pet'r's Suppl. Br., App. A. After meeting with the police and signing all these forms, Bagnell was well aware that the police were heavily involved, would almost certainly review his medical records, and might even talk with his medical providers. And unlike the child in Clark, who was too young to "understand the details of our criminal justice system," 135 S. Ct. at 2182, Bagnell is old enough to understand those details. Bagnell likely knew that anything he said to his *971 medical providers about the incident would end up in his medical records, records that the police or prosecutors would then obtain. He also may have known that prosecutors might use those records in a future trial, should one occur. It is therefore probable that his conversations with medical providers served a dual purpose: to ensure adequate medical treatment and to create an out-of-court substitute for trial testimony.
¶52 But it is a stretch to say that the primary purpose of those conversations was to create an out-of-court substitute for trial testimony. Bagnell most likely would have seen the same medical providers, even if he had not signed the *776 release forms, for the sole purpose of receiving follow-up care. After signing those forms, his follow-up visits may have taken on an additional purpose. But it is unlikely that this additional purpose was ever primary, over and above his purpose of receiving medical treatment. And the record before us suggests that the medical providers were also primarily, if not solely, concerned with Bagnell's well-being. Majority 962-63.
¶53 With these observations, I respectfully concur in the majority's analysis of federal constitutional law.

"In criminal prosecutions the accused shall have the right ... to meet the witnesses against him face to face ...." Wash. Const. art. I, § 22.

State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986).